**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                                              :
*In re*                                                       :        **Chapter 11**
                                                              :
**DAFFY'S, INC.,**                                            :        **Case No. 12-_____  (__)**
                                                              :
                    **Debtor.**                               :
                                                              :
--------------------------------------------------------------x

# DEBTOR'S PLAN UNDER
## CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
Debra A. Dandeneau
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Proposed Attorneys for the Debtor*
*and Debtor in Possession*

Dated: August 1, 2012

# ARTICLE I
## DEFINITIONS AND INTERPRETATION

A.    **Definitions**.

The following terms used herein shall have the respective meanings set forth below:

1.1    ***Administrative Expense*** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate, (b) any actual and necessary costs and expenses of operating the Debtor's business, (c) any indebtedness or obligations incurred or assumed by the Debtor in Possession during the Chapter 11 Case, and (d) any compensation for professional services rendered and reimbursement of expenses incurred. Any fee or charge assessed against the Estate under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense and shall be paid in accordance with Section 2.3 of the Plan.

1.2    ***Administrative Expense Objection Deadline*** means the first Business Day that is **thirty (30) days** after the Effective Date, as such date may be extended from time to time by order of the Bankruptcy Court.

1.3    ***Affiliate*** means as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

1.4    ***Agency Agreement*** means that certain Agency Agreement, dated July 31, 2012, among the Debtor, Gordon Brothers Retail Partners, LLC, and Hilco Merchant Resources, LLC.

1.5    ***Allowed*** means as follows:

(a)    With respect to any Claim (other than an Administrative Expense) proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court,

    (i)    as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent asserted in the proof of such Claim, or

    (ii)    as to which an objection has been interposed, such Claim to the extent that it has been allowed in whole or in part by a Final Order of the Bankruptcy Court or, to

the extent permitted by the Plan or the Bankruptcy Code, by an agreement with the Debtor or the objecting party and the holder of such Claim.

(b) With respect to any Claim (other than an Administrative Expense) that is listed on the Debtor's Schedules and no proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c) by the Bankruptcy Court,

    (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that it has been listed by the Debtor in its Schedules as liquidated in amount and not disputed or contingent, or

    (ii) as to which an objection has been interposed, such Claim to the extent that it has been allowed in whole or in part by a Final Order of the Bankruptcy Court or, to the extent permitted by the Plan or the Bankruptcy Code, by an agreement with the Debtor or the objecting party and the holder of such Claim.

(c) With respect to any Claim that is asserted to be an Administrative Expense,

    (i) that represents an actual or necessary expense of preserving the estate or operating the Debtor's business for payment of goods, services, wages, or benefits or for credit extended to the Debtor in Possession, any such Claim to the extent that such claim is reflected as a postpetition liability of the Debtor on the Debtor's books and records as of the Effective Date;

    (ii) in an action against the Debtor commenced after the Commencement Date and pending as of the Confirmation Date, any such Claim to the extent it is allowed by a Final Order of a court of competent jurisdiction or by agreement between the Post Effective Date Debtor and the holder of such Administrative Expense, and

    (iii) timely filed in accordance with the Bar Date Order, any such Claim to the extent,

        (1) no objection is interposed by the Administrative Expense Objection Deadline, or

        (2) if an objection is interposed by the Administrative Expense Objection Deadline, is allowed in whole or in part by a Final Order of the Bankruptcy Court; or

    (iv) that represents a Claim of a professional person employed under section 327 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code or an Administrative Expense arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code, such Claim to the extent it is allowed by a Final Order of the Bankruptcy Court; or

US_ACTIVE:\44037104\16\39982.0003

(v)  that is an amount properly due and owing under the DIP Credit Facility.

1.6    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim and (b) the Estimated Amount of such Claim.

1.7    ***APA Approval Order*** means the order of the Bankruptcy Court, dated as of _____, 2012, (i) authorizing the Debtor's assumption of the Purchase Agreement, (ii) authorizing the Debtor's entry into the Herald Square Assignment Agreement and the assumption and assignment of the Herald Square Lease to the Purchaser pursuant to section 365 of the Bankruptcy Code and Section 11 of the Purchase Agreement and (iii) extending to two hundred ten (210) days after the Commencement Date the period under section 365(d)(4)(A)(i) of the Bankruptcy Code [Docket No. __].

1.8    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

1.9    ***Bankruptcy Court*** means the United States District Court for the Southern District of New York (or if venue of the Chapter 11 Case is transferred to another district, the United States District Court for such district), having jurisdiction over the Chapter 11 Case and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court constituted pursuant to section 151 of title 28 of the United States Code.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time and as applicable to the Chapter 11 Case.

1.11    ***Bar Date Order*** means that certain *Order Fixing a Final Date for Filing Requests for Payment of Certain Administrative Expenses, Establishing Deadlines for Filing Proofs of Claim for Prepetition Claims, and Approving the Form and Manner of Notice Thereof, Pursuant to Sections 502(b)(9) and 503(a) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7), (f), and (l), and 3003(c)(3), and Local Rule 3003-1*, dated August [__], 2012 [Docket No. __].

1.12    ***Business Day*** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    ***Cash*** means lawful currency of the United States, including, but not limited to, bank deposits, checks, and other similar items.

1.14    ***Causes of Action*** means any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim, and demand whatsoever, whether known or unknown, in law, equity, or otherwise.

1.15    ***Chapter 11 Case*** means the case commenced by the Debtor styled as "*In re Daffy's, Inc.*" and being administered in the Bankruptcy Court under case number 12-_____ (____) under chapter 11 of the Bankruptcy Code.

3

1.16    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.17    ***Claims Agent*** means Donlin, Recano & Company, Inc.

1.18    ***Collateral*** means any property or interest in property of the Estate subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not avoided or otherwise invalid under the Bankruptcy Code or applicable state law.

1.19    ***Commencement Date*** means August 1, 2012.

1.20    ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.21    ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.22    ***Confirmation Objection Deadline*** means the date set by the Bankruptcy Court as the last date to file an objection to the Plan.

1.23    ***Confirmation Order*** means the order or orders of the Bankruptcy Court confirming the Plan.

1.24    ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the Debtor now or hereafter exists or previously existed.

1.25    ***Cure Costs*** means any and all amounts payable to a counterparty of an executory contract or unexpired lease upon assumption of such executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code.

1.26    ***Daffy's*** means Daffy's, Inc., a New Jersey corporation.

1.27    ***Daffy's Revolving Credit Loan Agreement*** means that certain Loan and Security Agreement, dated January 30, 2009 (as amended), among Daffy's, Inc., as borrower, Vim-3, L.L.C., Vimwilco, L.P. and Vim Associates, as guarantors, and Wells Fargo Bank, N.A., as lender, providing for a revolving credit facility in an initial amount of $17,500,000.

1.28    ***Daffy's Term Credit Loan Agreement*** means that certain Loan and Security Agreement, dated January 30, 2009 (as amended), among Daffy's, Inc., as borrower, Vim-3, L.L.C., Vimwilco, L.P. and Vim Associates, as guarantors, and Wells

4

Fargo Bank, N.A., as lender, providing for a term loan in an initial principal amount of $13,000,000.

1.29    **Debtor** means Daffy's.  References to "the Debtor" hereunder shall, from and after the occurrence of the Effective Date, be deemed also to refer to and include the Post Effective Date Debtor.

1.30    **Debtor in Possession** means the Debtor in its capacity as a debtor in possession in the Chapter 11 Case pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1.31    **Deposit** means the deposit, in the amount of twenty million dollars ($20,000,000), provided by the Purchaser to the Debtor in connection with and according to the terms and conditions of the Purchase Agreement.

1.32    **DIP Credit Agreement** means that certain *Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement*, by and between the Debtor, as borrower; Vim-3, L.L.C., Vimwilco, L.P., and Marcia Wilson, as successor to Vim Associates, as guarantors; and Wells Fargo Bank, National Association, as lender.

1.33    **DIP Credit Facility Claim** means all Claims of Wells Fargo arising under the DIP Credit Agreement and related documents.

1.34    **Disallowed** means a Claim or Administrative Expense to the extent disallowed by an order of the Bankruptcy Court or such other court that has jurisdiction over such Claim or Administrative Expense.

1.35    **Disputed** means, with reference to an Administrative Expense or Claim, an Administrative Expense or Claim that is neither Allowed nor Disallowed.

1.36    **Disputed Amount** means the Estimated Amount of a Disputed Claim or, if no Estimated Amount exists, the amount set forth in the proof of claim relating to such Disputed Claim as the liquidated amount of such Disputed Claim, or, if no proof of claim has been filed but a party in interest has objected to the allowance of such claim, the amount listed on the Debtor's schedules as the liquidated amount of such Disputed Claim.

1.37    **Distribution Date** means a date on which the Post Effective Date Debtor makes a distribution to a holder of an Allowed Claim, which shall be the later of the Initial Distribution Date and the date that is within fourteen (14) days after such Claim becomes Allowed.

1.38    **Distribution Record Date** means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be five (5) Business Days from and after the Confirmation Date.

1.39    **Effective Date** means a Business Day selected by the Debtor, which shall be the Closing under, and in accordance with, the Purchase Agreement, on which (a) no stay of the Confirmation Order is in effect, and (b) all the conditions precedent to the

5

effectiveness of the Plan specified in Section 9.1 of the Plan shall have been satisfied or waived as provided in Section 9.2 of the Plan.

1.40    **Equity Interest** means the interest of any holder of equity securities of the Debtor represented by issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.41    **Estate** means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Case.

1.42    **Estimated Amount** means the maximum estimated dollar value of a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, either pursuant to an order of the Bankruptcy Court or agreement between the holder of the Disputed Claim and the Debtor.

1.43    **Federal Judgment Rate** means the federal judgment rate in effect as of the Commencement Date, compounded annually.

1.44    **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.45    **General Bar Date** means the date by which holders of Claims are required to file proofs of Claims against the Debtor pursuant to the Bar Date Order.

1.46    **General Unsecured Claim** means any Claim against the Debtor other than an Administrative Expense, Priority Tax Claim, Other Priority Claim, Wells Fargo Secured Claims, Other Secured Claim, or Equity Interest.

1.47    **Governmental Bar Date** means the date by which governmental units (as defined in section 101(27) of the Bankruptcy Code) are required to file proofs of Claims against the Debtor pursuant to the Bar Date Order.

1.48    **Governmental Claims** means Claims against the Debtor filed by governmental units (as defined in section 101(27) of the Bankruptcy Code).

6

1.49    *Herald Square Assignment Agreement* means the assumption and assignment of lease agreement effectuating the assumption by the Debtor of the Herald Square Lease and assignment of the Herald Square Lease to the Purchaser pursuant to section 365 of the Bankruptcy Code and Section 11 of the Purchase Agreement.

1.50    *Herald Square Lease* means that certain lease agreement between Herald Center Department Store of New York, LLC, as successor-in-interest to Herald Center Department Store, L.P., and the Debtor, dated September 2, 1993, and all amendments or modifications thereto, for certain space in the building located in One Herald Square, New York, New York, and commonly known as Herald Center.

1.51    *Herald Square Payment* means the amount to be paid in cash by the Purchaser to the Debtor pursuant to and under the Herald Square Assignment Agreement, which amount shall be equal to twenty million dollars ($20,000,000), as adjusted by Section 10.4(d) of the Purchase Agreement.

1.52    *Initial Distribution Date* means the date as soon as reasonably practicable after Effective Date, but in no event later than thirty (30) days after such date, as determined by the Post Effective Date Debtor, on which the Post Effective Date Debtor makes its initial distribution to holders of Allowed Claims.

1.53    *Jericho Acquisitions* means Jericho Acquisitions I LLC, and any assignees of its rights and obligations under the Purchase Agreement pursuant to section 14 thereof.

1.54    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.55    *Local Bankruptcy Rules* means the Local Bankruptcy Rules for the Southern District of New York, as amended from time to time and as applicable to the Chapter 11 Case.

1.56    *Option Agreement* means the Option Agreement, dated as of December 12, 2011, by and between Daffy's, Inc., a New Jersey corporation, and Herald Center Department Store Tenant LLC, a Delaware limited liability company, as amended.

1.57    *Other Priority Claim* means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment under section 507(a)(3), (4), (5), (6), (7), (9) or (10) of the Bankruptcy Code.

1.58    *Other Secured Claims* means any Secured Claim against the Debtor not constituting a Wells Fargo Secured Claim.

1.59    *Outside Date* means eighteen (18) months after the Effective Date.

1.60    *Person* means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

7

1.61    ***Plan*** means this Plan Under Chapter 11 of the Bankruptcy Code, dated as of August 1, 2012, including, without limitation, the schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.62    ***Post Effective Date Debtor*** means the Debtor on and after the Effective Date.

1.63    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.64    ***Purchase Agreement*** means that certain Asset Purchase, Assignment and Support Agreement, dated as July 18, 2012, among the Debtor, Marcia Wilson, The Wilson 2003 Family Trust, and Jericho Acquisitions, a copy of which is annexed hereto as ***Exhibit "1.64."***

1.65    ***Purchaser*** means Jericho Acquisitions and any assignees or designees of the rights to acquire leasehold interests under the Purchase Agreement.

1.66    ***Real Property Leases*** means the real property leases and interests in real property leased to the Debtor as lessee as set forth on ***Exhibit "1.66,"*** as such Exhibit may be amended from time to time in accordance with the Purchase Agreement.

1.67    ***Real Property Lease Assumption or Rejection Deadline*** means the date that is two hundred ten (210) days after the Commencement Date, whether or not such date occurs after the Effective Date.

1.68    ***Real Property Lease Assumption or Rejection Notice Deadline*** means the date that is the earlier of (i) one hundred ninety (190) days after the Commencement Date, whether or not such date occurs after the Effective Date, and (ii) ninety (90) days following the Effective Date.

1.69    ***Rejection Damages Claim*** means any Claim of a holder of a Real Property Lease or other executory contract arising as a result of the rejection under section 365 of the Bankruptcy Code of such lease, as limited by section 502(b) of the Bankruptcy Code.

1.70    ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Chapter 11 Case, as may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.71    ***Secured Claim*** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a

8

permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.72    ***Segregated Creditor Fund*** means that certain segregated account created as of the Effective Date and administered by the Post Effective Date Debtor that is funded with Cash in an amount equal to the sum of (a) the total Allowed Amount of all Allowed Claims, (b) the total Disputed Amount of all Disputed Claims, (c) $1,000,000.00 (representing approximately two times the historical annual amount of Governmental Claims other than Claims of the U.S. Customs Service and trust fund taxes), and (d) interest on the sum of (a), (b), and (c) calculated at the Federal Judgment Rate through the date that is one (1) year from the Confirmation Date, from which distributions shall be made to holders of Allowed Claims in accordance with the Plan.

1.73    ***U.S. Trustee*** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

1.74    ***Swap Agreement*** means that certain Amended and Restated Swap Transaction Confirmation, dated February 5, 2009, between Daffy's, Inc. and Wells Fargo.

1.75    ***Vim-3/Vimwilco Credit Loan Agreement*** means that certain Amended and Restated Loan and Security Agreement, dated January 30, 2009, among Vim-3, L.L.C. and Vimwilco, L.P., as borrowers, Daffy's, Inc. and Vim Associates, as guarantors, and Wells Fargo Bank, N.A., as lender, providing for (i) a term loan in an initial principal amount of $8,500,000, (ii) a mortgage loan in an initial principal amount of $599,999.32 and (iii) a mortgage loan in an initial principal amount of $2,760,000.

1.76    ***Wells Fargo*** means Wells Fargo Bank, National Association.

1.77    ***Wells Fargo Secured Claims*** means Wells Fargo's Claims arising from the (i) Daffy's Revolving Credit Loan Agreement, (ii) Daffy's Term Credit Loan Agreement, (iii) Vim-3/Vimwilco Credit Loan Agreement, and (iv) Swap Agreement.

**B.    Interpretation; Application of Definitions and Rules of Construction**.

The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

9

## ARTICLE II
## PROVISIONS FOR PAYMENT OF
## ADMINISTRATIVEEXPENSES AND PRIORITY TAX CLAIMS

2.1     *Administrative Expenses*.

(a)     <u>Payment of Allowed Administrative Expenses</u>.  Except to the extent that any entity entitled to payment of any Allowed Administrative Expense agrees to a less favorable treatment, has been paid during the Chapter 11 Case, or is provided for elsewhere in this Plan, each holder of an Allowed Administrative Expense shall receive Cash in an amount equal to such Allowed Administrative Expense on or as soon as reasonably practicable following the later to occur of (a) Effective Date and (b) the date such Administrative Expense becomes an Allowed Administrative Expense; *provided*, *however*, that Administrative Expenses that are Allowed under Section 1.5(c)(i) hereof shall be paid in full and performed by the Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

(b)     <u>Professional Compensation and Reimbursement Claims</u>.  All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense.  The Post Effective Date Debtor is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including the reasonable fees and expenses of counsel to the Post Effective Date Debtor.

(c)     <u>DIP Credit Facility Claim</u>.  On the Effective Date, the DIP Credit Facility Claim shall be paid in full, in cash.  Unless otherwise agreed to by Wells Fargo, to the extent that any letters of credit issued or deemed issued pursuant to the DIP Credit Agreement (or related documents) remain outstanding on the Effective Date, the Debtor will pay or cause to be issued to Wells Fargo cash or a letter of credit in an amount equal to the face amount of such letters of credit, which shall be held by Wells Fargo for the reimbursement of all amounts drawn with respect to such letters of credit.  To the extent that a letter of credit is returned or expires without being drawn, Wells Fargo shall return to the Debtor any cash or letter of credit paid or issued to Wells Fargo with respect to such letter of credit.

2.2     *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, payment in Cash in the full amount of such Allowed Priority Tax Claim, on or as soon as reasonably practicable following the latest to occur of (x) the Effective Date, (y) the date on

US_ACTIVE:\44037104\16\39982.0003

which such Priority Tax Claim becomes Allowed, and (z) the date such Priority Tax Claim is payable under applicable non-bankruptcy law.

2.3    *Statutory Fees.*

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date, with interest under title 31 of section 3717, if any.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND
## EQUITY INTERESTS, IMPAIRMENT AND VOTING

**The Plan provides that all holders of Allowed Claims against the Debtor shall receive payment, in full, and with interest, if applicable, on account of their Allowed Claims. Equity Interests in the Debtor shall remain outstanding and will receive the Debtor's remaining assets after (i) all Allowed Administrative Expenses and Allowed Claims have been paid in full, and (ii) all Disputed Claims and Disputed Administrative Expenses have been Allowed and paid in full or Disallowed. As a result, all classes of Claims and Equity Interests are unimpaired under the Plan are therefore deemed to accept the Plan and, in accordance with section 1126 of the Bankruptcy Code, are not entitled to vote to accept or reject the Plan.**

The following table designates the classes of Claims against, and Equity Interests in, the Debtor.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Wells Fargo Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Equity Interests | Unimpaired | No (deemed to accept) |

## ARTICLE IV
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1    *Other Priority Claims (Class 1).*

(a)    <u>Impairment and Voting.</u>  Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Distribution Date, each holder of an Allowed Other Priority Claim shall receive Cash in the Allowed Amount of such Other Priority Claim plus interest at the Federal Judgment Rate, on such Allowed Other Priority Claim from the Commencement Date to and including the Distribution Date.

11

4.2 ***Wells Fargo Secured Claims (Class 2).***

   (a) <u>Impairment and Voting</u>.  Class 2 is unimpaired by the Plan.  The holder of the Allowed Wells Fargo Secured Claims is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

   (b) <u>Allowance of the Wells Fargo Secured Claims</u>.  The Wells Fargo Secured Claims shall be Allowed in an amount equal to the amount of unpaid principal, interest, and fees outstanding as of the Commencement Date *less* the amount of the Wells Fargo Secured Claims "rolled up" into the DIP Credit Facility Claim, plus applicable interest and fees owed in accordance with the terms of the agreements governing the Wells Fargo Secured Claims.

   (c) <u>Distributions</u>.  Except to the extent that the holder of the Allowed Wells Fargo Secured Claims agrees to a different treatment, on the Effective Date the holder of the Allowed Wells Fargo Secured Claims shall receive Cash in an amount equal to the Allowed Amount of the Wells Fargo Secured Claims *less* any payments made on the Wells Fargo Secured Claims during the Chapter 11 Case and *less* (i) any payments made on the Wells Fargo Secured Claims from the refinancing or repayment of the loan arising under the Vim-3/Vimwilco Credit Loan Agreement, including with proceeds from the sale of the real estate owned by Vim-3, L.L.C., Vimwilco, L.P., and Vim Associates, or (ii) any obligations under the Wells Fargo Secured Claims from which Wells Fargo agrees to release the Debtor.

4.3 ***Other Secured Claims (Class 3).***

   (a) <u>Impairment and Voting</u>.  Class 3 is unimpaired by the Plan.  To the extent any Allowed Other Secured Claims exist, each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

   (b) <u>Distributions</u>.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date the holder of any Other Secured Claim shall receive Cash in an amount equal to the Allowed Amount of an Other Secured Claim.

4.4 ***General Unsecured Claims (Class 4).***

   (a) <u>Impairment and Voting</u>.  Class 4 is unimpaired by the Plan.  Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

   (b) <u>Distributions</u>.  On the Distribution Date, each holder of an Allowed General Unsecured Claim shall receive Cash in the Allowed Amount of its General Unsecured Claim plus interest at the Federal Judgment Rate on such Allowed General Unsecured Claim from the Commencement Date to and including the Distribution Date.

US_ACTIVE:\44037104\16\39982.0003

4.5    *Equity Interests (Class 5)*.

(a)    Impairment and Voting.  Class 5 is unimpaired by the Plan. Each holder of an Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of Equity Interests shall retain its Equity Interests and shall be entitled to participate in any distribution of the remaining assets of the Post Effective Date Debtor in accordance with the terms and conditions of any instrument, document, or agreement governing its Equity Interests; *provided*, *however*, that no distributions shall be made with respect to any Equity Interests until after the latest to occur of (i) the Governmental Bar Date, (ii) all Administrative Expenses and Claims have been Allowed or Disallowed, and (iii) all Allowed Administrative Expenses and Allowed Claims have been paid in full in accordance with the terms of the Plan.

**ARTICLE V**
**MEANS OF IMPLEMENTATION**

5.1    *Corporate Actions.*

On or as soon as practicable after the Effective Date, the Post Effective Date Debtor shall take such actions as may be or become necessary to effectuate the Plan and any transactions contemplated thereby, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule, including, without limitation, engaging in any transaction to effectuate the Purchase Agreement.

5.2    *Approval of Purchase Agreement.*

(a)    Purchase Agreement.  On the Effective Date, the Debtor shall consummate the transactions set forth in the Purchase Agreement and shall sell, assign, transfer convey, and deliver all right, title and interest in, under and to each of the Purchased Assets (as defined in the Purchase Agreement) to the Purchaser in exchange for payment of the Purchase Price (as defined in the Purchase Agreement) in accordance with the terms of the Purchase Agreement.

(b)    Payment of Purchase Price; Additional Funds.  As consideration for the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to the Purchaser, (i) the Purchaser shall provide, or cause to be provided, to the Debtor cash in the amount of twenty-three million dollars ($23,000,000), subject to adjustment as set forth in the Purchase Agreement, less the amount of the Herald Square Payment to the extent it has been paid to the Debtor prior to the Effective Date, and (ii) the Debtor shall draw on the letter of credit evidencing the Deposit.  To the extent that it is determined, in accordance with Section 7.5 of the Purchase Agreement, that the Purchase Price, when combined with the total Cash in the Estate as of the Effective Date will be insufficient to fully fund the Segregated Creditor Fund, and one or more of Jericho Acquisitions and any holder of Equity Interests (together, the "***Funding Parties***") has determined to provide to the Debtor additional Cash to fund the Segregated Creditor Fund, such Funding Parties shall provide or cause to be provided to the Debtor on the Effective Date the necessary funds to ensure that the Segregated Creditor Fund is fully funded on

13

the Effective Date. If such additional funds are provided and, on the date that the Governmental Bar Date has passed, all Administrative Expenses and Claims have been Allowed or Disallowed, and all Allowed Administrative Expenses and Allowed Claims have been paid in full in accordance with the terms of the Plan, there remain additional funds in the Segregated Creditor Fund, (x) to the extent that such additional funds were provided by only one of the Funding Parties, such remaining funds shall be returned to the Funding Party that provided the additional funds, and (y) to the extent that the additional funds were contributed by more than one of the Funding Parties, such remaining funds shall be returned to the Funding Parties proportionately by the amount so funded by each party.

(c)    Approval of Purchase Agreement; Waiver of Requirement to Comply with Any Bulk Sales Laws. As permitted by sections 1123(a)(5) and 1123(b)(4) of the Bankruptcy Code, confirmation of the Plan by the Bankruptcy Court shall constitute approval of the Purchase Agreement and authorization for the Debtor to consummate the transactions set forth therein. Neither the Debtor nor the Purchaser shall have any obligation to comply with any applicable nonbankruptcy law that imposes conditions or restrictions on the transactions set forth in the Purchase Agreement, including, without limitation, any bulk sales law or similar laws.

(d)    Sale Free and Clear. On and after the Effective Date, pursuant to the Purchase Agreement and this Plan, the Purchased Assets shall be purchased, acquired, assumed, and accepted by and vested in the Purchaser free and clear of all Claims, Equity Interests, Liens, charges, encumbrances, and all other rights arising on or before the Effective Date, except for the rights of any lessors from and after the Effective Date under any Real Property Leases to the extent provided herein. The Purchaser shall not be deemed to (i) be the successor of the Debtor by reason of any theory at law or in equity, (ii) except with respect to the Real Property Leases and as specifically set forth herein and in the Purchase Agreement and any other agreements entered into in connection with the Purchase Agreement (including, without limitation, any agreements with any Affiliates of the Debtor), assume, incur or be responsible for any Claims or Liabilities of the Debtor or any of its Affiliates, (iii) have, de facto or otherwise, merged with or into the Debtor, or (iv) be a mere or substantial continuation of the Debtor or the enterprise of the Debtor. The Purchaser shall not assume or have any liability or obligation for any Claim against the Debtor except for those liabilities specifically assumed by the Purchaser pursuant to the terms of the Purchase Agreement.

(e)    Deemed Exercise of Option Agreement. The sale, assignment, transfer, conveyance and delivery of the Herald Square Lease to the Purchaser shall be deemed an exercise of, and closing of the transactions contemplated by, the Option Agreement.

5.3    **Post Effective Date Debtor.**

On and after the Effective Date, the Debtor shall continue to exist as the Post Effective Date Debtor, with all the powers of a corporation under applicable law. On and after the Effective Date, the Post Effective Date Debtor may use and dispose of property and compromise or settle any Claims in accordance with the provisions of this Plan and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, or the Purchase Agreement. To the extent necessary or as contemplated by

US_ACTIVE:\44037104\16\39982.0003

the Purchase Agreement, the Post Effective Date Debtor's certificate of incorporation shall be amended to comply with section 1123(a)(6) of the Bankruptcy Code and to change its name.

(a)    <u>Governance and Management of the Post Effective Date Debtor</u>. The initial board of directors and the officers of the Post Effective Date Debtor shall be the same as the Debtor's board of directors and officers as of the Commencement Date, and the initial compensation of such directors and officers as of the Effective Date shall remain the same as the compensation as of the Commencement Date.

(b)    <u>No Further Corporate Action</u>.  Except as otherwise provided in the Plan, each of the matters provided for under the Plan involving any corporate action to be taken by or required of the Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including but not limited to, holders of Claims against, or Equity Interests in, the Debtor, or directors or officers of the Debtor.

(c)    <u>Effectuating Documents</u>.  The Debtor's officers and directors, as appropriate, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

5.4    ***Vesting of Estate Assets.***

(a)    On the Effective Date, and except as otherwise set forth herein, all property of the Estate in existence as of the Effective Date and that is not sold to the Purchaser upon the closing of the Purchase Agreement shall vest in the Post Effective Date Debtor free and clear of all Claims, Liens, charges, encumbrances, rights, and interests of creditors and equity security holders but subject to the rights of holders of Allowed Administrative Expenses and Allowed Claims against, and Equity Interests in, the Debtor as provided herein.

5.5    ***Duties and Powers of the Post Effective Date Debtor.***

(a)    <u>General Authority</u>.  The Post Effective Date Debtor, together with its representatives and professionals, shall administer the Plan.  In such capacity, the powers of the Post Effective Date Debtor shall include any and all powers necessary to implement the Plan and to administer and distribute the assets and wind up the business and affairs of the Debtor, including, but not limited to, (i) consummating the transactions set forth in the Purchase Agreement, (ii) administering the Agency Agreement (including, without limitation, collecting any amounts due to the Debtor thereunder and reconciling or resolving any disputes); (iii) resolving Disputed Claims or Disputed Administrative Expenses (including the ability to object to, seek to compromise, or settle, any or all Disputed Claims and Disputed Administrative Expenses), (iv) liquidating assets, (v) abandoning assets, (vi) retaining professionals, (vii) maintaining books and records, (viii) entering into agreements, (ix) investing Cash, and (x) paying any and all reasonable fees and expenses of the Post Effective Date Debtor.

15

(b)        Tax Obligations.

The Post Effective Date Debtor shall be further authorized to (i) administer and pay taxes, including filing of tax returns, (ii) request an expedited determination of any unpaid tax liability of the Post Effective Date Debtor or the Estate under section 505 of the Bankruptcy Code for all taxable periods of the Debtor through the liquidation of the Post Effective Date Debtor as determined under applicable tax laws, and (iii) represent the interest and account of the Post Effective Date Debtor or the Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

5.6        *Method of Distributions Under the Plan.*

(a)        All payments to be made under the Plan shall be made by the Post Effective Date Debtor or an agent appointed by the Debtor, such as the Claims Agent.

(b)        No distributions of any assets of the Estate shall be made to holders of Equity Interests until the latest to occur of (i) the Governmental Bar Date, (ii) all Administrative Expenses and Claims have been Allowed or Disallowed, and (iii) all Allowed Administrative Expenses and Allowed Claims have been paid in full in accordance with the terms of the Plan. *All distributions to the holders of Equity Interests from and after such date shall not be subject to avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.*

(c)        Notwithstanding anything in this Plan to the contrary, the Post Effective Date Debtor shall have the authority to object to the allowance or payment of any Disputed Claims or Disputed Administrative Expenses on any grounds in accordance with the procedures set forth herein, and the Post Effective Date Debtor shall not be obligated to make any distributions on account of such Disputed Claims or Disputed Administrative Expenses until and unless such Disputed Claims or Disputed Administrative Expenses become Allowed.

5.7        *Closing of the Debtor's Chapter 11 Case.*

Following the Governmental Bar Date, when all Disputed Claims and Disputed Administrative Expenses have become Allowed Claims or Allowed Administrative Expenses or Disallowed Claims or Disallowed Administrative Expenses, and all distributions have been made with respect to Allowed Administrative Expenses and Allowed Claims, the Post Effective Date Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.8        *Termination of the Post Effective Date Debtor.*

Unless the board of directors of the Post Effective Date Debtor authorizes the Post Effective Date Debtor to opt out of this Section 5.8 or votes to extend the Outside Date, the Post Effective Date Debtor will dissolve after the liquidation, administration, and distribution of the Cash and any other assets of the Debtor in accordance with the Plan and its material completion of all other duties and functions set forth herein, but in no event later than the Outside Date. Upon such dissolution, the Post Effective Date Debtor shall cause to be filed with the State of

16

New Jersey and any other governmental authority such certificate of dissolution and other certificates or documents as may be or become necessary to implement the termination of the legal existence of the Post Effective Date Debtor.  Unless the board of directors of the Post Effective Date Debtor authorizes the Post Effective Date Debtor to opt out of this Section 5.8, the Post Effective Date Debtor shall not require any further corporate authorization to effectuate the dissolution of the Post Effective Date Debtor, and this Plan and the Confirmation Order shall constitute authorization to effectuate such dissolution.

### 5.9    *Cancellation of Existing Instruments*

Except as otherwise expressly provided in the Plan or with respect to executory contracts or unexpired leases that have been assumed and assigned by the Debtor, all instruments evidencing any Claims against the Estate shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtor and Post Effective Date Debtor thereunder shall be discharged.

## ARTICLE VI
## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 6.1    *Voting of Claims*.

All holders of Claims are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### 6.2    *Distributions on Allowed General Unsecured Claims.*

All Allowed General Unsecured Claims held by a single creditor shall be aggregated and treated as a single Claim.  At the written request of the Debtor, any creditor holding multiple Allowed General Unsecured Claims shall provide to the Post Effective Date Debtor a single address to which any distributions shall be sent.

### 6.3    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.4    *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, as applicable, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.  Payment shall be made to the holder of the Allowed Claim on the Distribution Record Date, unless the holder of such Allowed Claim has directed the Debtor, in writing, to make payment to a third party (including through

17

the filing of a proof of Claim instructing the Debtor to make payment to a third party thereon).  A holder of an Allowed Claim shall not receive a distribution under this Plan unless it provides to the Debtor a tax identification number.  Nothing in this Plan shall require the Post Effective Date Debtor to attempt to locate any holder of an Allowed Claim to the extent the Post Effective Date Debtor complies with the Section, and a distribution or other notice is returned undeliverable.

6.5     *Unclaimed Distributions*.

All distributions under the Plan that are unclaimed (including, without limitation, distributions that are returned to the Post Effective Date Debtor as undeliverable) for a period of six (6) months after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.  Such property shall then be deemed to be an asset of the Post Effective Date Debtor and the Post Effective Date Debtor shall not be required to comply with any applicable state escheatment laws.

6.6     *Distribution Record Date*.

With respect to holders of all General Unsecured Claims, on the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim thereafter shall be prohibited.   The Debtor shall have no obligation to recognize any transfer of any such Claims occurring after the close of business after such date, and, other than Claims that are expressly permitted under the Plan to be filed after the Distribution Record Date, the Debtor shall have no obligation to recognize any Claims filed on the Claims register from and after the Distribution Record Date.

6.7     *Manner of Payment*.

At the option of the Post Effective Date Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.8     *Setoffs and Recoupment*.

The Debtor may, but shall not be required to, offset against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim it may have against such claimant.

6.9     *Payment of Statutory Fees*.

The Debtor shall pay all U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside the ordinary course of business, until the entry of a final decree, dismissal of the case, or conversion of the case to a case under chapter 7 of the Bankruptcy Code.

US_ACTIVE:\44037104\16\39982.0003

## ARTICLE VII
## PROCEDURES FOR TREATING DISPUTED
## CLAIMS AND ADMINISTRATIVE EXPENSESS UNDER PLAN

7.1     *Objections*.

From and after the Effective Date, objections to, and requests for estimation of, Administrative Expenses and Claims against the Debtor may be interposed and prosecuted only by the Post Effective Date Debtor; *provided*, *however*, that Jericho Acquisitions shall have the right to object to any Rejection Damages Claims asserted by any lessor under a Real Property Lease that is rejected or deemed rejected.  Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of the following: (i) one hundred and eighty (180) days after the Effective Date; (ii) thirty (30) days after the date on which such Claim or Administrative Expense was filed; and (iii) such later date as may be fixed by the Bankruptcy Court.

7.2     *Segregated Creditor Fund*

On or before the Effective Date, the Debtor shall establish a Segregated Creditor Fund from which the Post Effective Date Debtor shall make distributions to holders of Allowed Claims in accordance with the terms of the Plan to the extent such Allowed Claims are not paid on the Effective Date.  At the Debtor's election, the Segregated Creditor Fund may be maintained with the Claims Agent.  The Post Effective Date Debtor shall maintain the Segregated Creditor Fund until the occurrence of each of (i) the Governmental Bar Date, (ii) all Administrative Expenses and Claims have been Allowed or Disallowed, and (iii) all Allowed Administrative Expenses and Allowed Claims have been paid in full in accordance with the terms of the Plan.

7.3     *Distributions After Allowance*.

To the extent that a Disputed Claim or Disputed Administrative Expense ultimately becomes an Allowed Claim or Allowed Administrative Expense, any distribution with respect to such Allowed Claim or Allowed Administrative Expense shall be made to the holder of such Allowed Claim or Allowed Administrative Expense in accordance with the provisions of the Plan.

7.4     *Resolution of Claims*.

On and after the Effective Date, the Post Effective Date Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims or Administrative Expenses, and to compromise, settle or otherwise resolve any Disputed Claims or Disputed Administrative Expenses without the approval of the Bankruptcy Court; *provided*, *however*, that any resolution of any objection to a Rejection Damages Claim asserted by any lessor under a Real Property Lease that is rejected or deemed rejected may only be made by, or with the written consent of, Jericho Acquisitions.

US_ACTIVE:\44037104\16\39982.0003

7.5      *Estimation of Claims.*

The Debtor may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  The determination of an Estimated Amount with respect to a Disputed Claim shall not bar the Debtor from objecting to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

# ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1      *Assumption of Executory Contracts or Unexpired Leases*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, any executory contracts or unexpired leases listed on *Exhibit "8.1"* hereto shall be deemed to have been assumed by the Debtor as of the Effective Date, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute approval of such assumptions pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor and its estate.

8.2      *Cure Amounts*

With respect to each such executory contract or unexpired lease assumed by the Debtor pursuant to Section 8.1 hereof, unless, prior to the Effective Date (1) the Bankruptcy Court determines otherwise pursuant to a Final Order or (2) the parties to the executory contract or unexpired lease agree otherwise, the dollar amount required to cure any defaults of the Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth on *Exhibit "8.1"* hereto with respect to such executory contract or unexpired lease unless an objection to the proposed cure amount is filed by the Confirmation Objection Deadline.  Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense under the Plan unless an objection is timely filed, and, upon payment of such Allowed Administrative Expense, all defaults of the Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed to have been cured.

8.3      *Rejection of Any Remaining Executory Contracts and Unexpired Leases*.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any person or entity, including,

20

without limitation, the executory contracts and unexpired leases set forth on ***Exhibit "8.3"*** hereto, shall be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (a) that has been rejected by an order of the Bankruptcy Court prior to the Effective Date, (b) that constitutes a Real Property Lease under the Purchase Agreement as set forth on ***Exhibit "1.66"*** hereto, (c) that has been assumed or assumed and assigned pursuant to an order of the Bankruptcy Court signed prior to the Effective Date, which order may be the Confirmation Order, (d) as to which a motion for approval of the assumption or assumption and assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (e) set forth on ***Exhibit "8.1"*** hereto.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.3 of the Plan.

8.4    ***Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to Section 8.3 the Plan***.

Any proofs of Claim for a Rejection Damages Claim arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.3 of the Plan must be filed with the Bankruptcy Court and served upon the Claims Agent on or before the General Bar Date.  **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtor and its Estate or the Post Effective Date Debtor and its property**.

8.5    ***Treatment of Real Property Leases.***

(a)    Assumption and Assignment.  As of the Effective Date, pursuant to sections 365(b) and 1123(b)(2) of the Bankruptcy Code, the Purchase Agreement, and this Plan, with respect to the Real Property Leases, subject to Section 8.5(c) hereof, the Debtor shall have the right, but not the obligation (except as provided in the Purchase Agreement), to assume and assign such leases to Jericho Acquisitions, and entry of the Confirmation Order shall constitute approval of the Bankruptcy Court of the Debtor's assumption and assignment of the Real Property Leases to Jericho Acquisitions.

(b)    Cure Costs.  The proposed Cure Costs payable upon assumption of each Real Property Lease is set forth on ***Exhibit "1.66"*** hereto.  **Except as provided in Section 8.5(c)(i) hereof, any objection to the assumption and assignment of any Real Property Lease to a Purchaser or the proposed Cure Costs thereto must be filed by the Confirmation Objection Deadline; if and to the extent a lessor does not timely file any such objection, it will be forever barred from asserting such objection and shall be deemed to have consented to such assumption and assignment, or Cure Costs (as applicable).**  Upon assumption of a Real Property Lease, payment of the Cure Costs in accordance with this Section shall constitute the Debtor's only obligation to cure defaults under the Real Property Lease, and all defaults shall be deemed to have been cured as of the date of such payment.

(c)    Election to Assume and Assign or to Reject a Real Property Lease.  Prior to the Real Property Lease Assumption or Rejection Notice Deadline, the Debtor shall notify each lessor under a Real Property Lease how its Real Property Lease will be treated

21

under section 365 of the Bankruptcy Code.  The procedure for assumption and assignment or rejection of the Real Property Leases shall be as follows:

(i)    If the Debtor, at the direction of Jericho Acquisitions, notifies a lessor under a Real Property Lease that such Real Property Lease will be assumed and assigned to Jericho Acquisitions or another Purchaser designated by Jericho Acquisitions, such lessor shall have fourteen (14) days from the date on which the Debtor provides written notice to the lessor to file an objection in the Bankruptcy Court to the assignment of such Real Property Lease to Jericho Acquisitions or the designated Purchaser, as the case may be, only on the basis of a lack of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code, and the Bankruptcy Court may conduct a hearing (which may be the Confirmation Hearing) on such objection on shortened notice, if possible.  Such Real Property Lease shall be deemed assumed and assigned to Jericho Acquisitions or the designated Purchaser, as the case may be, on the date that is the first Business Day after the expiration of such 14-day objection period (if no timely objection is filed) or, if a timely objection is filed, on the date on which the Bankruptcy Court enters an order approving the assignment to Jericho Acquisitions or the designated Purchaser, as the case may be, and the Debtor shall pay any Cure Costs to the lessor on the date that is five (5) Business Days after the later of the date on which such assumption and assignment is effective and, if the lessor has objected to the amount of the Cure Costs, the date on which an order of the Bankruptcy Court determining the Cure Costs becomes a Final Order.  In the event that the Debtor provides notice to a lessor under a Real Property Lease on or before the Real Property Lease Assumption or Rejection Notice Deadline that such Real Property Lease will be assumed and assigned to Jericho Acquisitions or another Purchaser designated by Jericho Acquisitions as provided in Section 2.2(g) of the Purchase Agreement and this Section 8.5(c), but the order approving such assumption and assignment is not entered on or before the Real Property Lease Assumption or Rejection Deadline, the Real Property Assumption or Rejection Deadline for such Real Property Lease shall automatically be deemed extended until the date of entry of the order either approving or denying the assumption and assignment of such Real Property Lease, and the lessor under such Real Property Lease shall be deemed to consent to such extension.  If the Bankruptcy Court enters an order denying approval of the assignment of a Real Property Lease to Jericho Acquisitions or the designated Purchaser, as the case may be, then such Real Property Lease shall be deemed rejected as of the date of such order, and the lessor shall have a Rejection Damages Claim against the Estate in accordance with Section 8.5(e) hereof.

(ii)    If the Debtor, at the direction of Jericho Acquisitions, notifies a lessor under a Real Property Lease that such Real Property Lease will be rejected, such Real Property Lease shall be deemed rejected as of the date of such notice, and the lessor shall have a Rejection Damages Claim against the Estate in accordance with Section 8.5(e) hereof.

(d)    <u>Timely Performance of Obligations under Real Property Lease Until Assumption and Assignment or Rejection</u>.  From and after the Effective Date and until a Real Property Lease is assumed and assigned to a Purchaser or rejected in accordance with the provisions of this Section 8.5, the Post Effective Date Debtor shall timely perform its obligations under such Real Property Lease.

22

(e)    Rejection Damages Claims.  Any proofs of Claim for a Rejection Damages Claim arising out of the rejection of any Real Property Lease must be filed with the Bankruptcy Court and served upon the Claims Agent so as to be received on or before the later of (i) the General Bar Date, and (ii) the date that is twenty-one days following the effective date of such rejection.  **All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtor and its Estate or the Post Effective Date Debtor and its property**.

(f)    Security Deposits.  Except as provided in Sections 2.2(h) and 7.19 of the Purchase Agreement, the Debtor shall not take any action to take possession of, cancel, extinguish or otherwise affect any outstanding letters of credit held by lessors under any of the Real Property Leases, and all cash security deposits held by lessors under any of the Real Property Leases shall remain in place; *provided*, that nothing shall restrict a lessor of a Real Property Lease that is rejected in accordance with the terms hereof from taking any actions with respect to such deposits from and after the date that the Real Property Lease is rejected.

8.6    ***Insurance Policies and Agreements.***

The Debtor does not believe that the insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Commencement Date constitute executory contracts.  To the extent that such insurance policies or agreements are determined to be executory contracts, then, notwithstanding anything contained in Article VIII of the Plan to the contrary, the Plan shall constitute a motion to assume such insurance policies and agreements.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor and its estate in this Chapter 11 Case.

Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement.

Nothing contained in the Plan, including this Section, shall constitute a waiver of any claim, right, or Cause of Action that the Debtor or Post Effective Date Debtor, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement.

### ARTICLE IX
### CONDITIONS PRECEDENT TO EFFECTIVE DATE

9.1    ***Conditions Precedent to Effectiveness***.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 9.2 of the Plan:

(a)    The Confirmation Order, in form and substance acceptable to the Debtor and Jericho Acquisitions, shall have been entered;

23

(b)      All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtor;

(c)      All conditions precedent to the occurrence of the Closing Date (as such term is defined in the Purchase Agreement) under the Purchase Agreement other than the occurrence of the Effective Date have been satisfied or waived;

(d)      All authorizations, consents and regulatory approvals, if any, required by the Debtor in connection with the consummation of the Plan are obtained and not revoked; and

(e)      All amounts outstanding under the Vim-3/Vimwilco Credit Loan Agreement shall have been paid in full.

9.2      *Waiver of Conditions*.

Each of the conditions precedent in Section 9.1 hereof may be waived, in whole or in part, by the Debtor, with the written consent of Jericho Acquisitions.  Subject to the foregoing sentence, any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

9.3      *Satisfaction of Conditions*.

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that any of the conditions specified in Section 9.1 of the Plan has not occurred or otherwise been waived pursuant to Section 9.2 of the Plan ninety (90) days after the Confirmation Order becomes a Final Order, (a) the Confirmation Order shall be vacated, (b) the Debtor and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) the Debtor's obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

## ARTICLE X
## EFFECT OF CONFIRMATION

10.1      *Vesting of Assets*.

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b)-(c) of the Bankruptcy Code, the Debtor, its properties and interests in property and its operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estate shall vest in the Post Effective Date Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests.

US_ACTIVE:\44037104\16\39982.0003

10.2    *Binding Effect*.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

10.3    *Termination of Claims and Equity Interests*.

Except as provided in the Plan, from and after the Effective Date, all holders of Claims and Administrative Expenses against the Debtor or the Estate shall be precluded and enjoined from asserting against the Post Effective Date Debtor, its successors or assignees, holders of Equity Interests, or any of its or their assets or properties, any other or further Claim or Administrative Expense against the Debtor based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

10.4    *Injunction or Stay*.

**Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims or Administrative Expenses against the Debtor or the Estate are permanently enjoined, from and after the Effective Date from taking any of the following actions:**

**(a) commencing or continuing in any manner any action or other proceeding of any kind on or with respect to or in any way related to any such Claim or Administrative Expenses against the Post Effective Date Debtor or any of its respective assets or properties, including, without limitation, any distributions or transfers made (including to holders of Equity Interests) payable from the assets or properties of the Estate or the Post Effective Date Debtor;**

**(b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Post Effective Date Debtor or any of its respective assets or properties, including, without limitation, any distributions or transfers made (including to holders of Equity Interests) payable from the assets or properties of the Estate or the Post Effective Date Debtor, with respect to or in any way related to such Claim or Administrative Expense;**

**(c) creating, perfecting or enforcing any encumbrance of any kind against the Post Effective Date Debtor or against the property or interests in property of the Post Effective Date Debtor with respect to or in any way related to such Claim or Administrative Expense;**

**(d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Post Effective Date Debtor or against the property or**

25

interests in property of the Post Effective Date Debtor with respect to or in any way related to such Claim or Administrative Expense;

(e) acting or proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or Confirmation Order;

(f) commencing, continuing, or asserting in any manner any action or other proceeding of any kind with respect to any Claims or Administrative Expenses that are extinguished, released or settled pursuant to the Plan; and

(g) taking any actions to interfere with the implementation or consummation of the Plan.

10.5    *Terms of Injunction or Stay*.

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date; *provided*, *however*, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan, the Confirmation Order, or any agreements assumed under section 365 of the Bankruptcy Code or entered into during the Chapter 11 Case.

10.6    *Reservation of Causes of Action/Reservation of Rights*.

Nothing contained in the Plan, except as set forth in Section 10.7 of this Plan, or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtor, or the Post Effective Date Debtor may have or may choose to assert against any parties.

10.7    *Exculpation*.

None of the Debtor, the Post Effective Date Debtor, Wells Fargo, Jericho Acquisitions and any Purchaser, Gordon Brothers Retail Partners, LLC, and Hilco Merchant Resources, LLC, or any of such parties' respective officers, directors, managers, members accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, and representatives (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, consultants and representatives) shall have or incur any liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Case, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Case or the Plan (in each case whether arising prior to or following the Commencement Date); *provided*, *however*, that the foregoing shall not affect the liability of any person under any contracts, instrument, document, or other agreement with the Debtor or any liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

26

10.8    **Releases.**

As of the Effective Date, and in consideration of the substantial contribution of Jericho Acquisitions and any Purchaser and their respective Affiliates, the Debtor shall release unconditionally and forever release each of Jericho Acquisitions and any Purchaser and their Affiliates, and their respective present or former directors, managers, officers, members, equity holders (and their respective Affiliates), employees, agents, financial advisors, partners, attorneys, and other professional advisors or representatives from any and all Claims, demands, causes of action and the like, relating to the Plan as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; *provided*, *however*, that nothing in this release shall be construed as a release of any obligations of any Purchaser, or any claims arising, under the Purchase Agreement or any agreements relating to, or entered into in connection with, the Purchase Agreement.

## ARTICLE XI
## RETENTION OF JURISDICTION

11.1    The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Case, the Confirmation Order, and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, the following:

(a)    To hear and determine applications for the rejection of executory contracts or unexpired leases and Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for estimation of, Disputed Claims, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)    To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document

27

governing or relating to any of the foregoing, or any settlement approved by the Bankruptcy Court;

(i)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtor prior to the Effective Date or request by the Post Effective Date Debtor after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(j)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(k)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     To determine any matters arising from or relating to the APA Approval Order or the Purchase Agreement;

(m)     To hear and determine any rights, Claims or Causes of Action held by or accruing to the Estate pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)     To recover all assets of the Debtor and property of the Estate, wherever located;

(o)     To enter a final decree closing the Chapter 11 Case; and

(p)     To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

### 12.1     *Effectuating Documents and Further Transactions*.

On or before the Effective Date, and without the need for any further order or authority, the Debtor shall execute, as appropriate, such agreements and other documents that are in form and substance reasonably satisfactory to the Debtor as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Purchase Agreement.  The Post Effective Date Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Purchase Agreement.

US_ACTIVE:\44037104\16\39982.0003

12.2    *Withholding and Reporting Requirements*.

In connection with the Plan, any party making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

12.3    *Exemption from Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan, including, without limitation, the transfers contemplated by the Purchase Agreement, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

12.4    *Corporate Action*.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors or stockholders of the Debtor, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the state in which the Debtor or the Post Effective Date Debtor is incorporated or established, without any requirement of further action by the directors or stockholders of the Debtor or the Post Effective Date Debtor.

12.5    *Modification of Plan*.

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date pursuant to section 1127(a) of the Bankruptcy Code, provided that such alterations, amendments or modifications are reasonably acceptable to Jericho Acquisitions.  The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation pursuant to section 1127(b) of the Bankruptcy Code.  Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court so long as such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests and are not inconsistent with the terms of the Purchase Agreement and the transactions contemplated thereby.

US_ACTIVE:\44037104\16\39982.0003

12.6    ***Revocation or Withdrawal of the Plan***.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date; so long as such revocation or withdrawal would not result in a breach of the Purchase Agreement. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

12.7    ***Exhibits/Schedules***.

All exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

12.8    ***Substantial Consummation***.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.9    ***Severability of Plan Provisions***.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, *however*, that, such alteration or interpretation shall not be inconsistent with the Purchase Agreement and the transactions contemplated thereby and shall not modify or alter the obligations, conditions and rights of Jericho Acquisitions herein or under the Purchase Agreement unless Jericho Acquisitions expressly consents in writing. Notwithstanding any such holding, alteration or interpretation, unless agreed otherwise by the Debtor with the written consent of Jericho Acquisitions (to the extent required by the provisions of this section), the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.10    ***Governing Law***.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

US_ACTIVE:\44037104\16\39982.0003

12.11    *Notices*.

All notices, requests and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor, to:

Daffy's, Inc.
One Daffy's Way
Secaucus, New Jersey 07094
Attn: Richard Kramer
Facsimile: (201) 902-9016

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Debra A. Dandeneau
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ref. # 39982.0003

If to Wells Fargo, to:

Wells Fargo Bank, National Association
One Boston Place, 18th Floor
Boston, Massachusetts 02108
Attention: Brent E. Shay (Daffy's Inc.)
Facsimile: (866) 328-8544

– and –

Riemer & Braunstein LLP
Three Center Plaza, 6th Floor
Boston, Massachusetts 02108
Attn: Donald E. Rothman, Esq.
Facsimile: (617) 692-3556

31

If to Jericho Acquisitions, to:

> Fried, Frank, Harris, Shriver & Jacobson LLP
> One New York Plaza
> New York, NY 10004
> Attn: Brad Eric Scheler, Esq.
> Facsimile: (212) 859-4000

If to the Claims Agent, to:

> Donlin, Recano & Company, Inc.
> Re: Daffy's, Inc.
> 419 Park Avenue South, Suite 1206
> New York, NY 10016
> Telephone: (212) 771-1128

32

Dated: August 1, 2012

Respectfully submitted,


Daffy's, Inc.


By: /s/ Richard F. Kramer
      Name: Richard F. Kramer
      Title:  Vice President of Finance and Secretary

US_ACTIVE:\44037104\16\39982.0003

## **Exhibit 1.64**

### **Purchase Agreement**

**EXECUTION VERSION**

 

 

**ASSET PURCHASE, ASSIGNMENT AND SUPPORT AGREEMENT**

**by and among**
**DAFFY'S, INC.**
**and**
**MARCIA WILSON**
**and**
**THE WILSON 2003 FAMILY TRUST**
**and**
**JERICHO ACQUISITIONS I LLC**

 

**Dated as of July 18, 2012**

# Table of Contents

**Page No.**

Section 1.   Definitions.................................................................................................... 1

Section 2.   Asset Sale.................................................................................................... 8

Section 3.   Fees and Expenses. .................................................................................... 13

Section 4.   Representations and Warranties of the Company ......................................... 14

Section 5.   Representations and Warranties of the Shareholder ...................................... 17

Section 6.   Representations and Warranties of the Purchaser ......................................... 18

Section 7.   Covenants.................................................................................................. 19

Section 8.   Conditions to Closing................................................................................. 25

Section 9.   Closing ..................................................................................................... 27

Section 10.   Termination............................................................................................... 28

Section 11.   Herald Square Lease Assignment. .............................................................. 31

Section 12.   No Survival. .............................................................................................. 32

Section 13.   Notices. .................................................................................................... 32

Section 14.   Assignment................................................................................................ 34

Section 15.   Entire Agreement ...................................................................................... 34

Section 16.   Governing Law, Venue .............................................................................. 34

Section 17.   Waivers and Amendments .......................................................................... 34

Section 18.   Miscellaneous........................................................................................... 35

## Exhibits

| | |
|---|---|
| Exhibit A | Herald Square Assignment Agreement |
| Exhibit B | Form Assignment and Assumption of Lease Agreement |
| Exhibit C | Bill of Sale |
| Exhibit D | Form IP Assignment |

## Schedules

| | |
|---|---|
| Schedule I | Purchased Intellectual Property |
| Schedule II | Purchased Leases |
| Schedule III | Ownership of Equity Interests |

This ASSET PURCHASE, ASSIGNMENT AND SUPPORT AGREEMENT (this "Agreement"), dated as of July 18, 2012, is by and among Daffy's, Inc., a New Jersey corporation (the "Company"), Marcia Wilson, in her personal capacity and in her capacity as trustee of The Wilson 2003 Family Trust (each a "Shareholder" and, collectively, the "Shareholders"), and Jericho Acquisitions I LLC, a Delaware limited liability company, or its designees and assigns (the "Purchaser").

## RECITALS

WHEREAS, the Company intends to commence a case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, in connection with the Chapter 11 Case, the Company intends to propose and submit to the Bankruptcy Court a plan of liquidation;

WHEREAS, in connection with the plan of liquidation and subject to Bankruptcy Court approval, the Company desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept such assignment and assume all of the Company's right, title and interest in and to (i) the Company's real property leases, including certain fixtures and certain other tangible personal property located on the property subject to those certain real property leases, and (ii) certain of the Company's intellectual property, as more specifically provided for herein and subject to the conditions set forth herein;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and for other good and valuable consideration, the parties hereto, intending to be legally bound hereby, agree as follows:

**Section 1.     Definitions.**

1.1      "18th Street Lease" means that certain lease agreement, dated October 1, 2006, between BJW Realty LLC and Daffy's, Inc., and any amendments or modifications thereto, for certain space in the building located at 3 East 18th Street, New York, New York.

1.2      "Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

1.3      "Agreement" shall have the meaning ascribed to such term in the Preamble.

1.4      "Alternate Transaction" means (a) any plan, proposal, offer, financing or transaction with one or more Persons other than the Purchaser with respect to, involving or relating to, directly or indirectly, any of the Purchased Assets or the Company's interests therein, (b) any modification or termination of any existing agreements with respect to, involving or relating to, directly or indirectly, any of the Purchased Assets or the Company's interests therein that is not consistent with the terms hereof or not as contemplated herein, or (c)

1

any direct or indirect encumbrance, sale, assumption and assignment or other disposition of any of the Purchased Assets, in each case other than as set forth herein and other than the Wells Fargo DIP Liens.

1.5     "APA Approval Motion" means the motion to be filed with the Bankruptcy Court, in form and substance mutually satisfactory to the Company and the Purchaser and consistent with this Agreement and the transactions contemplated herein, seeking (i) approval of this Agreement and all of the terms and conditions hereof, (ii) authorization for the Company to enter into the Herald Square Assignment Agreement and assume and assign the Herald Square Lease to the Purchaser pursuant to Section 365 of the Bankruptcy Code and Section 11 hereof and (iii) an extension under section 365(d)(4)(B)(i) of the Bankruptcy Code for ninety (90) days of the one hundred twenty (120) day period under section 365(d)(4)(A)(i) of the Bankruptcy Code.

1.6     "APA Approval Order" means the order of the Bankruptcy Court granting the APA Approval Motion, in form and substance mutually satisfactory to the Company and the Purchaser and consistent with this Agreement and the transactions contemplated herein.

1.7     "Assignment and Assumption of Option Agreement" means that certain assignment and assumption of the Option Agreement evidencing the assignment of the Option Agreement to the Purchaser as provided in Section 12 of the Option Agreement, in form and substance mutually satisfactory to the Purchaser and the Company, each acting reasonably.

1.8     "Bankruptcy Code" means title 11 of the United States Code, as applicable in the Chapter 11 Case.

1.9     "Bankruptcy Court" means the Bankruptcy Court for the Southern District of New York or any other court of competent jurisdiction presiding over the Chapter 11 Case.

1.10     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable in the Chapter 11 Case.

1.11     "Break-Up Fee" shall have the meaning ascribed to such term in Section 3.1 hereof.

1.12     "Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.

1.13     "Closing" shall have the meaning ascribed to such term in Section 9 hereof.

1.14     "Closing Date" means the first Business Day after all of the conditions to the closing contained in Section 8 have been satisfied or waived by the Company or the Purchaser (as applicable) (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of each of the conditions to the Closing as contained in Section 8) and provided that this Agreement has not been terminated in accordance with Section 10, or such other date as may be mutually agreed by the Company and the Purchaser.

2

1.15    "Claims" shall have the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

1.16    "Claims Bar Date" means the Governmental Claims Bar Date or the Non-Governmental Claims Bar Date, as applicable.

1.17    "Company" shall have the meaning ascribed to such term in the Preamble.

1.18    "Confirmation Order" means the order of the Bankruptcy Court, in form and substance mutually satisfactory to the Company and the Purchaser and consistent with this Agreement and the transactions contemplated herein, approving the Plan, which order shall provide, among other things, that: (i) all right, title and interest in and to any and all assets of every kind and nature to be sold, assigned or transferred to the Purchaser under the Transaction Documents shall be sold, assigned or transferred free and clear of any and all Liens and Claims (including any Liens and Claims of any governmental body); (ii) the Purchaser is a good faith purchaser of the Purchased Assets and is entitled to the protections afforded good faith purchasers under the Bankruptcy Code, including Section 363(m) thereof; (iii) except as specifically set forth herein and in the Plan, the Purchaser shall not have any successor or transferee Liability of any kind, nature or character, including Liabilities arising or resulting from or relating to the transactions contemplated by the Transaction Documents; (iv) the Company and the Purchaser are authorized to consummate the transactions contemplated in the Transaction Documents and enter into, execute and deliver all necessary documents; and (v) this Agreement, including the Purchase Price, has been negotiated in good faith and at arm's-length among the Purchaser and the Company for legitimate business purposes.

1.19    "Cure Costs" shall have the meaning ascribed to such term in Section 2.2(b) hereof.

1.20    "Deposit" shall have the meaning ascribed to such term in Section 2.5(b) hereof.

1.21    "Disclosure Statement" means, to the extent required in accordance with Section 7.5 hereof, a disclosure statement for the Plan, an advance copy of which shall be provided to the Purchaser for its review as soon as practicable and prior to its filing (and the reasonable comments of the Purchaser shall be considered by the Company), which is consistent with this Agreement and the transactions contemplated herein.

1.22    "Disclosure Statement Order" means, to the extent required in accordance with Section 7.5 hereof, the order of the Bankruptcy Court in accordance with Section 1125 of the Bankruptcy Code, the proposed form of which shall be provided to the Purchaser for its review as soon as practicable and prior to its filing (and the reasonable comments of the Purchaser shall be considered by the Company), which is consistent with this Agreement and the transactions contemplated herein.

1.23    "Equity Interests" means all issued and outstanding common and/or preferred stock of the Company, and any warrants, options and other similar rights to purchase or acquire such common and/or preferred stock.

1.24    "Expenses" shall have the meaning ascribed to such term in Section 3.2 hereof.

3

1.25    "Final Order" means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case, which has not been reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.26    "Fixtures" means (i) all real estate fixtures and leasehold improvements now or hereafter located at the properties subject to the Purchased Leases and (ii) personal property affixed to the properties subject to the Purchased Leases for retail stores (including without limitation built-in furniture) or personal property used to display or hold merchandise for retail sale now or hereafter located at the properties subject to the Purchased Leases for retail stores.

1.27    "Governmental Claims Bar Date" means the last date on which governmental parties may file proofs of Claims against the Company, which date shall be no later than one hundred eighty (180) days following the Petition Date, unless otherwise agreed to by the Purchaser in its reasonable discretion or ordered by the Bankruptcy Court.

1.28    "Herald Square Assignment Agreement" means the lease assumption and assignment agreement, in the form attached hereto as Exhibit A, or as otherwise approved by the Purchaser in its reasonable discretion effectuating the assumption by the Company of the Herald Square Lease and assignment of the Herald Square Lease to the Purchaser pursuant to Section 365 of the Bankruptcy Code and Section 11 hereof.

1.29    "Herald Square Lease" means that certain lease agreement between Herald Center Department Store of New York, LLC, as successor-in-interest to Herald Center Department Store, L.P., and the Company, dated September 2, 1993, and all amendments or modifications thereto, for certain space in the building located in One Herald Square, New York, New York, and commonly known as Herald Center.

1.30    "Herald Square Payment" means the amount to be paid in cash by the Purchaser to the Company pursuant to and under the Herald Square Assignment Agreement, which amount shall be equal to twenty million dollars ($20,000,000), as adjusted by Section 10.4(d) hereof.

1.31    "Herald Square Premises" means that certain space in the building located in One Herald Square, New York, New York, commonly known as Herald Center, which is subject to the Herald Square Lease.

1.32     "Intellectual Property" means, collectively, trademarks, service marks, trade names, domain names, trade dress, logos and designs and goodwill connected with the foregoing, patents, copyrights and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures, as well as other inventions, works of authorship, confidential information, technology, software and documentation, data and databases, and web sites), and any licenses to, registrations, or applications to register the foregoing.

1.33     "Liability" means any debt, liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for taxes, including taxes or other liabilities or costs arising as a result of the transactions contemplated by this Agreement or the Plan.

1.34     "Liens" means any lien (other than liens for taxes, assessments or other governmental charges not yet due and payable), encumbrance, pledge, mortgage, deed of trust, security interest, lease option, claims, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance.

1.35     "Liquidation" shall have the meaning ascribed to such term in Section 7.6 hereof.

1.36     "Liquidation Period" shall have the meaning ascribed to such term in Section 7.6 hereof.

1.37     "Liquidator Motion" means the motion of the Company for authorization to appoint and employ a liquidator and commence the Liquidation, an advance copy of which shall be provided to the Purchaser as soon as practicable and prior to its filing, which is consistent with this Agreement and the transactions contemplated herein.

1.38     "Liquidator Order" means the order of the Bankruptcy Court approving the Liquidator Motion, the proposed form of which shall be provided to the Purchaser as soon as practicable and prior to its filing, which is consistent with this Agreement and the transactions contemplated herein.

1.39     "Material Adverse Change" means any one or more changes, events, occurrences or effects, which individually or together with any other changes, events, occurrences or effects, have or result in, or would reasonably be expected to have or result in, any material adverse change to or effect on the Purchased Leases, Purchased Intellectual Property and/or the Purchased Fixtures, taken as a whole, or the ability of the Company to perform its obligations as set forth in any of the Transaction Documents, in each case except for any such change, event or effect (a) resulting from any changes in any applicable law, or in generally accepted accounting principles, which take effect after the date hereof; (b) resulting from any act or omission of the Company taken at the written direction of the Purchaser; or (c) resulting from the filing of the Chapter 11 Case.

1.40     "Non-Governmental Claims Bar Date" means the last date on which non-governmental parties in interest may file proofs of Claims against the Company, which date

5

shall be no later than thirty-five (35) days following the Petition Date, unless otherwise agreed to by the Purchaser in its reasonable discretion or ordered by the Bankruptcy Court.

1.41    "Option Agreement" means the Option Agreement, dated as of December 12, 2011, by and between Daffy's, Inc., a New Jersey corporation and Herald Center Department Store Tenant LLC, a Delaware limited liability company, as amended.

1.42    "Person" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, any other business entity, or a government entity (or any department, agency, or political subdivision thereof).

1.43    "Petition Date" means the date of the commencement of the Chapter 11 Case.

1.44    "Plan" means a plan of liquidation for the Company, including any documents, amendments or supplements relating or attached thereto, in form and substance mutually satisfactory to the Company and the Purchaser, each acting reasonably, and consistent with this Agreement and the transactions contemplated herein, or as thereafter modified by the Company (including any modifications required in accordance with Section 7.5 hereof), provided, that any such modifications are mutually satisfactory to the Company and the Purchaser, each acting reasonably, (i) the terms of which are consistent in all respects with this Agreement, (ii) that provides (a) for the release and exculpation of the Purchaser, its affiliates, shareholders, partners, directors, officers, employees, attorneys and advisors from Liability for participation in the transactions contemplated by the Transaction Documents, (b) except as otherwise provided in Section 7.5 hereof, that all allowed Claims against the Company will be paid in full and that the holders thereof will be unimpaired and deemed to accept the Plan (c) that the Proceeds shall be used first to satisfy all allowed Claims against the Company, including the funding of any required reserves, and (d) that no distributions shall be made to holders of Equity Interests until all allowed Claims against the Company have been paid in full, including the funding of any required reserves, and (iii) that has conditions to confirmation and the effective date of the Plan (and terms governing to what extent such conditions can be waived and by whom) that are consistent with this Agreement.

1.45    "Proceeds" means any and all proceeds from the liquidation of the Company's business, assets and estate and proceeds from the transactions contemplated by the Transaction Documents.

1.46    "Purchase Price" shall have the meaning ascribed to such term in Section 2.5 hereof.

1.47    "Purchased Assets" means the Purchased Fixtures, the Purchased Intellectual Property and Purchased Leases.

1.48    "Purchased Fixtures" means all of the Fixtures located on the properties subject to the Purchased Leases.

1.49    "Purchased Intellectual Property" means the Intellectual Property as set forth on Schedule I.

1.50   "Purchased Leases" means the real property leases and interests in real property leased to the Company as lessee as set forth on Schedule II, as such Schedule may be amended from time to time in accordance with this Agreement.

1.51   "Purchaser" shall have the meaning ascribed to such term in the Preamble.

1.52   "Rejection Damages Claim" means any Claim of the holder of a real property lease, which arises as a result of the rejection under section 365 of the Bankruptcy Code of such lease, as limited by section 502(b)(6) of the Bankruptcy Code.

1.53   "Shareholder" shall have the meaning ascribed to such term in the Preamble.

1.54   "Transaction Documents" means, collectively, this Agreement, the Plan and the agreements the forms of which are attached hereto as exhibits and any other instruments, or agreements contemplated by, and to be executed and delivered pursuant to, or to be executed in connection with the consummation of the transactions contemplated by, this Agreement. Transaction Documents shall not include that certain Agreement for Sale of Real Estate, dated as of the date hereof, by and among VIM-3, L.L.C., VIM Associates, VIMWILCO, L.P. and Jericho Acquisition II LLC.

1.55   "Transaction Expenses" shall have the meaning ascribed to such term in Section 3.2 hereof.

1.56   "Transfer Taxes" means any transfer, documentary, sales, use, stamp, recording, registration and other such taxes and fees (including interest, penalties and additions to tax in respect thereto); provided, that Transfer Taxes shall not include any taxes measured by net income or gain.

1.57   "VIM Leases" means, collectively, that certain amended and restated lease agreement, made as of January 1, 2012, between VIMWILCO, L.P. and Daffy's Inc., and any amendments or modifications thereto, for the building located at 1700 Chestnut Street at the southwest corner of 17th Street and Chestnut Streets, Philadelphia, PA; that certain lease agreement, dated August 14, 1996, between VIM-3, L.L.C. and Daffy's, Inc., and any amendments or modifications thereto, for the approximately 19 acre tract of land together with the existing building commonly known as One Daffy's Way, Secaucus, New Jersey; and that certain amended and restated lease agreement, dated as of January 1, 2012, between VIM Associates and Daffy's Inc. (f/k/a Daffy Dan's Bargaintown), and any amendments or modifications thereto, for the building located at 346 Route 10, East Hanover, New Jersey.

1.58   "Voluntary Compensation Payment" shall have the meaning ascribed to such term in the Section 7.17 hereof.

1.59   "Wells Fargo" means Wells Fargo Bank, N.A., in its capacity as the lender under the Wells Fargo Loan.

1.60   "Wells Fargo DIP Liens" means the Liens granted in favor of Wells Fargo in connection with any use of cash collateral or debtor-in-possession financing to be obtained by

the Company from Wells Fargo, the terms of which shall not be inconsistent with this Agreement and the transactions contemplated herein.

1.61    "Wells Fargo Liens" means, collectively, the Wells Fargo DIP Liens and Wells Fargo Loan Liens.

1.62    "Wells Fargo Loan Liens" means the Liens granted in favor of Wells Fargo under the Wells Fargo Loan.

1.63    "Wells Fargo Loan" means, collectively, (i) that certain Loan and Security Agreement, dated January 30, 2009 (as amended), among the Company, as borrower, VIM-3, L.L.C., VIMWILCO, L.P. and VIM Associates, as guarantors, and Wells Fargo, as lender, providing for a revolving credit facility in an initial amount of $17,500,000, and (ii) that certain Loan and Security Agreement, dated January 30, 2009 (as amended), among the Company, as borrower, VIM-3, L.L.C., VIMWILCO, L.P. and VIM Associates, as guarantors, and Wells Fargo, as lender, providing for a term loan in an initial principal amount of $13,000,000, as each may have been amended, modified or supplemented from time to time.

**Section 2.    Asset Sale.**

2.1    Purchase and Sale of Assets.  Subject to and on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code and the Plan, subject to approval of the Bankruptcy Court and entry of the Confirmation Order, and in reliance upon the representations, warranties and covenants set forth in this Agreement, at the Closing, the Company shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, and the Purchaser shall purchase, acquire, assume and accept from the Company, free and clear of any and all Liens and Claims, all of the Company's right, title and interest in, under and to:

(a)    all Purchased Leases;

(b)    all Purchased Fixtures; and

(c)    all Purchased Intellectual Property.

2.2    Assignment and Assumption of Purchased Leases.

(a)    At the Closing and pursuant to the Plan, Sections 363 and 365 of the Bankruptcy Code and Final Order (subject, however, to the provisions of Sections 8.1(b) and 8.2(b) hereof applicable to a Final Order) of the Bankruptcy Court, the Company shall sell or assume and assign to the Purchaser and the Purchaser shall buy or accept the assignment from the Company, as the case may be, of the Purchased Leases, and the Purchaser hereby agrees, from and after the Closing Date, to make all of the payments and perform all of the covenants, conditions and agreements of the Purchased Leases as if the Purchaser were the original tenant under the Purchased Leases.  On the Closing Date, the properties subject to the Purchased Leases shall be delivered to the Purchaser free and clear of all rights of occupancy (other than pursuant to the Purchased Leases), vacant, in broom clean condition and otherwise in "as is" condition.

8

(b)     The Company shall be responsible for and shall pay any and all cure amounts for the Purchased Leases and all other amounts payable to the counterparties to the Purchased Leases on account of the assumption of the Purchased Leases by the Company as determined by Final Order, which Final Order may be the Confirmation Order, excluding any attorneys' fees and expenses of the Purchaser in connection with the assumption of the Herald Square Lease (the "Cure Costs").

(c)     Notwithstanding anything to the contrary in this Agreement, the Purchaser, in its sole discretion, may designate that one or more of the Purchased Leases be assumed and assigned and delivered to one or more designees (which designee need not be an Affiliate of the Purchaser), so long as any such designee or designees is able to demonstrate to the satisfaction of the Bankruptcy Court adequate assurance of future performance under the Purchased Lease to be assigned to such designee pursuant to Section 365(f) of the Bankruptcy Code.  In accordance with Section 2.2(g), the Purchaser shall deliver to the Company a written schedule detailing the designations, if any, of the kind described in this Section 2.2(c).  In the event that the Purchaser makes the designation pursuant to this Section 2.2(c), provided the designee is able to satisfy the conditions set forth in this Section 2.2(c), on the Closing Date (or thereafter to the extent a designee is designated after the Closing Date), the designees that are so designated shall accept the assignment from the Company of the Purchased Leases the Purchaser so designates to such designees and such designees shall, from and after the assignment, make all of the payments and perform all of the covenants, conditions and agreements of such Purchased Leases as if the designees were the original tenants under the Purchased Leases being assigned to such designees; provided, that no such assignment shall relieve the Purchaser of its obligations to the Company hereunder or under any of the Transaction Documents.  In the event that any designee of the Purchaser is deemed not to have the necessary qualifications to show adequate assurance of future performance with respect to a Purchased Lease to be assigned to such designee, such Purchased Lease shall, at the Purchaser's direction, be assigned to the Purchaser or be excluded from the Purchased Leases and rejected by the Company in accordance with Section 2.2(e) hereof.

(d)     If by Final Order the Bankruptcy Court determines that any one or more of the Purchased Leases cannot be assumed and assigned to the Purchaser under the Plan (other than as a result of a failure to provide adequate assurance pursuant to Section 7.16 hereof), such leases shall be excluded from the Purchased Leases, shall no longer be a Purchased Lease and shall not be assumed by the Purchaser, and the Purchaser shall have no Liabilities or obligations in respect thereof.  If any leases shall be excluded from the Purchased Leases pursuant to this Section 2.2(d), there shall be no change to the Purchase Price, and the Purchaser shall not be responsible for any Rejection Damages Claims for such leases.

(e)     The Purchaser, in its sole discretion, from and after the date hereof, by written notice to the Company, may elect to exclude one or more leases from the Purchased Leases in accordance with Section 2.2(g) hereof.  Any lease designated in a notice pursuant to the preceding sentence shall no longer be a Purchased Lease and shall not be assumed by the Purchaser, and the Purchaser shall have no Liabilities or obligations in respect thereof, provided, however, that the Purchase Price shall be increased by the amount of all Rejection Damages Claims for such excluded leases; provided further, that there shall be no adjustment to the Purchase Price for any Rejection Damages Claims arising from the rejection of any of the

VIM Leases.  If any leases shall be excluded from the Purchased Leases pursuant to this Section 2.2(e), there shall be no reduction to the Purchase Price.

(f)     Not later than five (5) days prior to the Closing Date, Purchaser shall notify the Company, in writing, indicating which of the Purchased Leases shall be assumed and assigned by the Purchaser on the Closing Date and which of the Purchased Leases shall not be assumed and assigned on the Closing Date and shall have its treatment designated after the Closing Date pursuant to Section 2.2(g) hereof.

(g)     The Company and the Purchaser agree to the following procedure for the treatment of Purchased Leases under this Agreement:  In connection with the APA Approval Motion and APA Approval Order, the Company shall seek entry of an order of the Bankruptcy Court under section 365(d)(4)(B)(i) of the Bankruptcy Code extending for ninety (90) days the one hundred twenty (120) day period under section 365(d)(4)(A)(i) of the Bankruptcy Code. Subject to entry of such order, on or before the earlier of (a) the date that is one hundred ninety-five (195) days after the Petition Date and (b) ninety (90) days after the Closing Date, the Purchaser shall notify the Company in writing whether it wishes to elect one of the following options for each of the Purchased Leases:  (1) take a direct assignment of the Purchased Lease, (2) designate another entity to which the Purchased Lease will be assigned, or (3) reject the Purchased Lease.  Within two Business Days after receipt of such notice, the Company shall mail notice to the lessor under each Purchased Lease of the treatment of such Purchased Lease. If a lessor objects to any assumption and/or assignment of a Purchased Lease, the Company and the Purchaser shall as soon as practicable seek entry of an order of the Bankruptcy Court approving such assumption and assignment under section 365 of the Bankruptcy Code.  If the Company rejects a Purchased Lease because (i) the Purchaser elects to reject the Purchased Lease, (ii) the Bankruptcy Court enters an order denying the Company's request to assume and assign the Purchased Lease as a result of a failure to provide adequate assurance pursuant to Section 2.2(c) or Section 7.16 hereof or (iii) a Purchased Lease is deemed rejected, the Purchaser shall pay to the Company the full amount of any Rejection Damages Claim arising therefrom, either as determined by agreement of the Company, Purchaser, and the lessor, or as determined by a Final Order of the Bankruptcy Court, within five (5) Business Days after the date of such determination; provided, that the Purchaser shall have no obligation to pay the Company for any Rejection Damages Claims arising from rejection of any of the VIM Leases. From the Closing Date to the date on which a Purchased Lease either is assumed and assigned or rejected, the Purchaser shall hold the Company harmless from and against all liabilities and obligations arising with respect to such Purchased Lease.  To secure such obligation, and unless otherwise mutually agreed by the Company and the Purchaser, the Purchaser shall cause to be issued to the Company on the Closing Date a letter of credit issued by M&T Bank (or such other bank mutually satisfactory to the Company and the Purchaser), in form and substance mutually satisfactory to the Company and the Purchaser, having a face amount equal to the aggregate rent and additional rent for the ninety (90) day period after the Closing Date plus the estimated Rejection Damages Claim for each Purchased Lease, other than the Herald Square Lease and the VIM Leases, that on the Closing Date has not yet been assumed and assigned or rejected.

(h)     The Company and the Purchaser shall apportion as of the Closing Date: (a) all rent paid or payable under the Purchased Leases, (b) the Company's share (as lessee

under the Purchased Leases) of real estate taxes, common area charges, insurance costs and any other charges, if any, paid or payable under the Purchased Leases; and (c) fuel and utility charges, if any, it being understood and agreed that the Purchaser shall only be responsible for amounts incurred during or related to the period from and after the Closing as provided for in Section 2.7 hereof. Such amounts may be deducted from the Purchase Price to the extent that the same are payable by the Company, or such amounts shall be added to the Purchase Price to the extent that the same are payable by the Purchaser and shall be treated as Closing adjustments. The Purchaser shall notify those utility companies serving the applicable premises that the Purchaser shall be responsible for the payment of any and all obligations incurred therefor after the Closing Date for the utilities serving the premises, and shall cause meters to be read on such date. Telephone service, if any, for the applicable premises shall be terminated or transferred to the Purchaser's account by the Company as of the Closing Date. After giving effect to Section 7.19 hereof, the Purchaser shall reimburse the Company for any and all security deposits (whether in the form of cash, letter of credit or otherwise) and any and all other deposits the Company has paid under the 18th Street Lease and the VIM Leases. With respect to all other Purchased Leases, the Purchaser shall not have any obligation to reimburse the Company for any security deposits (whether in the form of cash, letter of credit or otherwise) or any and all other deposits the Company has paid under such Purchased Leases or with respect to the occupancy of the premises subject to any of the Purchased Leases (other than the 18th Street Lease and the VIM Leases). With respect to those Purchased Leases under which the landlord is holding a letter of credit as a security deposit, any and all such letters of credit shall remain in place following the Closing Date; provided, that with respect to the 18th Street Lease, the Purchaser shall use its commercially reasonable efforts (with the cooperation of the Company) to cause the landlord to accept, effective upon the Closing Date, a substitute letter of credit from the Purchaser and to return the existing letter of credit to the Company. If the landlord under the 18th Street Lease will not do so, the Purchaser shall provide a backstop letter of credit to the issuer of the existing letter of credit, in form and substance, including as to the issuing bank, acceptable to such issuer, or cash in an amount acceptable to the issuing bank to protect such issuer in the event that the landlord draws down all or part of the existing letter of credit.

      2.3   <u>Purchased Intellectual Property</u>. Except as otherwise provided in Section 7.14 hereof, the Company acknowledges and agrees that from and after the Closing Date, the Company shall have no right to and shall not use the Purchased Intellectual Property or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto. At the Closing, the Company shall grant or cause to be granted a royalty-free non-exclusive license to the Purchaser, in form and substance reasonably acceptable to the Purchaser, to continue using any Intellectual Property that is not Purchased Intellectual Property and that is, at the Closing Date affixed to or otherwise permanently displayed at or in the premises subject to the Purchased Leases (including, for the avoidance of doubt, any permanent signage located at such premises), which non-exclusive license shall continue only for so long as any Intellectual Property that is not Purchased Intellectual Property continues (without interruption) to be affixed to or otherwise permanently displayed at or in the premises subject to the Purchased Leases (including, for the avoidance of doubt, any permanent signage located at such premises). The foregoing non-exclusive license shall be freely

11

transferrable or sub-licensable by Purchaser to any subsequent purchaser or lessee of any premises subject to the Purchased Leases.

2.4    Option Agreement.  Subject to the delivery to the Company of the Assignment and Assumption of Option Agreement, the sale, assignment, transfer, conveyance and delivery of the Herald Square Lease to the Purchaser, pursuant to either Section 2.1 or Section 11 hereof, shall be deemed an exercise of, and closing of the transactions contemplated by, the Option Agreement.  The Company irrevocably agrees that it shall not seek to reject, nor shall it consent to the rejection of, the Option Agreement pursuant to Section 365 of the Bankruptcy Code during the Chapter 11 Case.

2.5    Purchase Price.

(a)    Subject to Sections 2.2(e), 2.5(b) and 11.3 hereof, as consideration for the sale, transfer, assignment, conveyance and delivery of the Purchased Assets by the Company to the Purchaser, the Purchaser shall pay to the Company cash in the aggregate amount of forty-three million dollars ($43,000,000) (the "Purchase Price").  The Purchase Price shall be paid to the Company by wire transfer from the Purchaser of immediately available funds on the Closing Date.

(b)    Within five (5) Business Days following the execution of this Agreement, the Purchaser shall provide the Company with a letter of credit issued by M&T Bank (or such other issuing bank mutually satisfactory to the Company and the Purchaser), in form and substance mutually satisfactory to the Company and the Purchaser, with a face amount of twenty million dollars ($20,000,000) (the "Deposit").  The letter of credit evidencing the Deposit shall name Wells Fargo as an additional beneficiary.  Upon the Closing, the Company shall be entitled to draw on the letter of credit in full and the Deposit shall be paid to the Company and credited against the Purchase Price and reduce the amount to be paid by the Purchaser on the Closing Date accordingly.  The Company may terminate this Agreement if the letter of credit evidencing the Deposit is not timely received.

2.6    Allocation of Purchase Price.  Prior to the Closing Date, the Purchaser shall provide the Company with a schedule allocating the Purchase Price among the Purchased Assets.  The Purchaser shall determine the allocation of the portion of the Purchase Price (exclusive of the Herald Square Payment) that is allocated to the Purchased Leases (other than the Herald Square Lease) among such leases, in such manner as it shall reasonably determine in writing prior to the Closing.  The parties to this Agreement shall file all tax returns (including Internal Revenue Service form 8594 to the extent required by law) consistent with such allocations, and no party shall take any position, for any tax purpose or otherwise, inconsistent with such allocations unless (and then only to the extent) otherwise required by law.

2.7    Exclusion of Liability.  Except with respect to the Liabilities and obligations expressly assumed by the Purchaser under the Purchased Leases pursuant to the Assignment and Assumption of Leases Agreement, this Agreement and the other Transaction Documents, the Purchaser shall assume no Liability or obligation of the Company, its predecessors or Affiliates whatsoever, including (i) any taxes related to the Purchased Assets for the periods (or portions thereof) ending on or prior to the Closing Date, and (ii) any Liabilities, damages or costs

12

relating to the Chapter 11 Case and the Company's liquidation and wind-up of its business and estate.

2.8     Transfer Taxes.

(a)     Except as provided in Section 2.8(b) hereof, the Company shall be responsible for and pay, and shall indemnify the Purchaser for, any and all Transfer Taxes due with respect to the sale, assignment, conveyance and delivery of the Purchased Assets to the Purchaser pursuant to the Transaction Documents.  Prior to the Closing, the Company shall prepare drafts of any required New York State or City real property transfer tax returns that are required to be filed in connection with the transactions contemplated by the Transaction Documents and provide a copy thereof for the Purchaser's review and comment and, to the extent the Herald Square Lease is sold, assigned, conveyed or delivered pursuant to Section 11.2 hereof, the Company shall accept all reasonable comments of the Purchaser with respect thereto.  The Purchaser shall use its commercially reasonable efforts to cooperate with the Company regarding the preparation and filing of such tax returns.

(b)     If the Herald Square Lease is sold, assigned, conveyed or delivered pursuant to Section 11.1 hereof, the Company shall be responsible for and pay, and shall indemnify the Purchaser for, any and all Transfer Taxes due with respect to the sale, assignment, conveyance and delivery of the Herald Square Lease to the Purchaser pursuant to the Herald Square Assignment Agreement.  If the Herald Square Lease is sold, assigned, conveyed or delivered pursuant to Section 11.2 hereof, each of the Company and the Purchaser shall be responsible for and shall pay fifty percent (50%) of any and all Transfer Taxes due with respect to the sale, assignment, conveyance and delivery of the Herald Square Lease to the Purchaser pursuant to the Herald Square Assignment Agreement.

**Section 3.**     Fees and Expenses.

3.1     In the event that the Company terminates this Agreement pursuant to Section 10.3(b) hereof, the Company shall pay to the Purchaser, in cash, a fee equal to one million, two hundred ninety thousand dollars ($1,290,000) (the "Break-Up Fee") in accordance with Section 10.4 hereof, which Break-Up Fee shall be subject to and fully earned upon the entry of the APA Approval Order.

3.2     In the event the Company terminates this Agreement pursuant to Section 10.3(b) hereof, the Purchaser shall be entitled to reimbursement of all actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the Purchaser, up to an aggregate amount of one million dollars ($1,000,000), including (i) fees, costs, expenses, disbursements and other charges of counsel to the Purchaser, Fried, Frank, Harris, Shriver & Jacobson LLP and (ii) fees, costs, expenses, disbursements and other charges of any other professionals retained by the Purchaser relating to the Transaction Documents or the transactions contemplated thereby (including investigating, negotiating, documenting and completing such transactions and enforcing, attempting to enforce and preserving any rights or remedies contemplated hereunder) or judicial and regulatory proceedings related to such transactions and the Chapter 11 Case (collectively, the "Expenses," and together with the Break-Up Fee, the "Transaction Expenses").

13

3.3    The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Purchaser would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

**Section 4.    Representations and Warranties of the Company.**  The Company represents, warrants and agrees with the Purchaser as set forth below.  Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>.  The Company is a duly organized, validly existing corporation in good standing under the laws of its state of incorporation or organization and has all requisite corporate power and authority to carry on its business as it is currently conducted or as currently contemplated to be conducted after consummation of the transactions contemplated hereunder and to own, lease and operate its properties where such properties are now owned, leased or operated.  The Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the conduct of its business makes such qualification necessary, except where the failure to be so qualified would not prevent consummation of the transactions contemplated by this Agreement.

4.2    <u>Corporate Power and Authority</u>.

(a)    The Company has the requisite corporate or other organizational power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder.  The Company has taken or shall take all necessary corporate or other organizational action required for the due authorization, execution, delivery and performance by it of this Agreement.

(b)    The Company has or, to the extent executed in the future, shall have when executed the requisite corporate or other organizational power and authority to enter into, execute, deliver and, where applicable, file the Transaction Documents to which it shall be a party and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h), 6006(d) and 3020(e) respectively, to perform its obligations thereunder.  The Company has taken or shall take all necessary corporate or other organizational action required for the due authorization, execution, delivery and performance by it of the Transaction Documents.

4.3    <u>Execution and Delivery; Enforceability</u>.

(a)    This Agreement has been duly and validly executed and delivered by the Company and shall constitute a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(b)    The Transaction Documents have been, or prior to their execution, delivery and, where applicable filing, shall be duly and validly executed and delivered by the Company, and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h), 6006(d) and

14

3020(e), each such document shall constitute a valid and binding obligation of the Company, enforceable against the Company to the extent a party thereto in accordance with its terms.

4.4    No Conflict.  The execution, delivery and, as applicable, the filing by the Company of the Transaction Documents and compliance by the Company with all of the provisions thereof and the consummation of the transactions contemplated therein shall not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any lien under the Purchased Leases, or any agreement relating to the Purchased Assets.

4.5    Consents and Approvals.

(a)    No consent, approval, authorization, order, registration or qualification of or with any Person, court or governmental agency or body having jurisdiction over the Company is required for the execution and delivery by the Company of the Transaction Documents or the performance of and compliance by the Company with all of the provisions thereof and the consummation of the transactions contemplated therein, except (i) the entry of the APA Approval Order, the Disclosure Statement Order (to the extent required in accordance with Section 7.5 hereof), and the Confirmation Order, and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h), 6006(d) and 3020(e), as applicable.

4.6    Arm's Length.  The Company acknowledges and agrees that the Purchaser is acting solely in the capacity of an arm's-length contractual counterparty to the Company with respect to the transactions contemplated by the Transaction Documents and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other Person or entity. Additionally, the Purchaser is not advising the Company or any other affiliated Person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated by the Transaction Documents, and the Purchaser shall have no responsibility or Liability to the Company or its respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Purchaser of the transactions contemplated by the Transaction Documents or other matters relating to such transactions shall be performed solely for the benefit of the Purchaser and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Purchaser with respect thereto.

4.7    Absence of Certain Changes.  Since January 1, 2012, except for actions to be taken pursuant to the Transaction Documents:

(a)    no event, fact or circumstance has occurred which has had or would reasonably be expected to give rise to, individually or in the aggregate, a Material Adverse Change;

15

(b)    the Company has not paid, discharged, waived, compromised, settled or otherwise satisfied any material legal proceeding relating to the Purchased Assets; and

(c)    the Company has not created any mortgage, pledge or lien with respect to any portion of the Purchased Assets, other than the Wells Fargo Liens.

4.8    <u>Pending Litigations or Causes of Action</u>.  Other than the Chapter 11 Case, there is no action, suit, proceeding or investigation pending, threatened or affecting any of the Purchased Assets or any of the Company's rights, title or interests thereunder, or the legality, validity or enforceability of the Transaction Documents or the consummation of the transactions contemplated thereunder or that might affect the ability of the Company to enter into the Transaction Documents or to consummate the transactions contemplated thereby and the Company is not aware of any existing ground on which any such action, suit or proceeding may be commenced.

4.9    <u>Leasehold Interests</u>.  The Company has provided the Purchaser with a full and complete list of each and every leasehold interest in real property of the Company and all files and documents related thereto and the Company has a valid, enforceable and binding leasehold interest in all of the Purchased Leases free and clear of any and all Liens and Claims.

4.10    <u>Purchased Leases</u>.  Other than any default caused by or resulting from the Chapter 11 Case or the Liquidation, the Company is not in material default under any of the Purchased Leases and the Company is current in respect of all payments or other amounts due under the Purchased Leases after giving effect to the payment of any Cure Costs.  The Company has not received any written notice, of any claim or default of any sort that has been asserted by anyone adverse to the rights of the Company under any of the Purchased Leases, or affecting, altering or questioning the rights of the Company to the continued possession and use of the leased property under any such Purchased Lease.  There are no impediments to the assumption of the Purchased Leases by the Company and subsequent assignment of such Purchased Leases to the Purchaser in the Chapter 11 Case, subject to the entry of the Confirmation Order.  Upon the Closing Date, all of the rights, title and interests in and to the Purchased Leases shall be assumed, assigned and transferred to the Purchaser free and clear of any and all Liens and Claims.

4.11    <u>Title to Intellectual Property</u>.  The Company has provided the Purchaser with a full and complete list of all Intellectual Property the Company owns or has an interest in.  The Company owns, and possesses the valid and enforceable right to sell to Purchaser, the Purchased Intellectual Property.  All applications to register and registrations of any Purchased Intellectual Property owned by the Company are (i) valid and in full force and effect; (ii) have not lapsed, expired or been abandoned (provided that the foregoing will not be deemed a representation that any registration for any trademark will issue upon application therefor); (iii) are not the subject of any opposition or cancellation filed with the United States Patent and Trademark Office, domain name registrar or any other applicable Intellectual Property registry; and (iv) are exclusively owned by the Company.  Upon the Closing Date, all of the rights, title and interests in and to the Purchased Intellectual Property shall be transferred to the Purchaser free and clear of all Liens and Claims.  To the knowledge of the Company, no Purchased Intellectual Property rights owned by the Company are being infringed by any other Person and

16

the conduct of the business of the Company as conducted does not infringe, misappropriate, or otherwise violate in any respect any Intellectual Property rights of others, which would have an adverse effect on the Purchased Intellectual Property.  The Company has not received any written notice of any claim of infringement, misappropriation, or other violation by the Company of the Intellectual Property rights of others, which would have an adverse effect on the Purchased Intellectual Property.

4.12    Title to Purchased Fixtures.  The Company has good and marketable title to the Purchased Fixtures free and clear of any and all Liens (other than the Wells Fargo Liens).  Upon the Closing Date, all of the rights, title and interests in and to the Purchased Fixtures shall be transferred to the Purchaser free and clear of all Liens and Claims.

4.13    No Broker's Fees.  The Company is not a party to any contract, agreement or understanding with any Person that would give rise to a valid claim against the Purchaser for a brokerage commission.

4.14    Alternate Transactions.  As of the date hereof, the Company is not party to any commitment, arrangement or agreement to pursue, implement or effectuate any Alternate Transaction.

**Section 5.    Representations and Warranties of Each Shareholder**.  Each Shareholder represents, warrants and agrees with the Purchaser as set forth below.  Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

5.1    Execution and Delivery; Enforceability.  This Agreement has been duly and validly executed and delivered by such Shareholder and shall constitute a valid and binding obligation of such Shareholder, enforceable against such Shareholder in accordance with its terms.  To the extent such Shareholder is an entity, such Shareholder (a) is a duly organized, validly existing entity in good standing under the laws of its state of incorporation or organization, (b) has the requisite organizational power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and (c) has taken or shall take all necessary organizational action required for the due authorization, execution, delivery and performance by it of this Agreement.

5.2    No Conflict.  The execution and delivery of this Agreement, the compliance by such Shareholder with the provisions of this Agreement applicable to such Shareholder and the consummation of the transactions contemplated herein shall not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under the Purchased Leases, or any agreement relating to the Purchased Assets.

5.3    Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Person, court or governmental agency or body having jurisdiction over such Shareholder is required for the execution and delivery by such Shareholder of this Agreement or the performance of and compliance by such Shareholder with all of the provisions hereof and the consummation of the transactions contemplated herein.

17

5.4     Alternate Transactions.  As of the date hereof, such Shareholder is not a party to any commitment, arrangement or agreement to pursue, implement or effectuate any Alternate Transaction.

5.5     Equity Interests.  Such Shareholder is the record owner of the Equity Interests set forth opposite such Shareholder's name on Schedule III and, to the extent any such Equity Interests is a voting security, has the ability to vote or cause to be voted all such Equity Interests and such Equity Interests are free and clear of any and all Liens, options, proxies, voting restrictions, rights of first refusals or other limitations on disposition or encumbrances of any kind that would adversely affect in any way such Shareholder's performance of its obligations under the Transaction Documents at the time such obligations are required to be performed.

**Section 6.        Representations and Warranties of the Purchaser.**  The Purchaser represents, warrants and agrees with the Company as set forth below.  Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

6.1     Incorporation.  The Purchaser has been duly organized and is a validly existing limited liability company, in good standing under the laws of the State of Delaware.

6.2     Corporate Power and Authority.  The Purchaser has the requisite limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement. Purchaser has or at the Closing Date will have financial capability to perform its obligations hereunder.

6.3     Execution and Delivery.  This Agreement has been duly and validly executed and delivered by the Purchaser and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

6.4     No Conflict.  The execution and delivery by the Purchaser of each of the Transaction Documents to which it is a party and the compliance by the Purchaser with all of the provisions thereof and the consummation of the transactions contemplated therein shall not result in any violation of the provisions of the governance documents of the Purchaser.

6.5     Consents and Approvals.

(a)     No consent, approval, authorization, order, registration or qualification of or with any Person, court or governmental agency or body having jurisdiction over the Purchaser is required for the execution and delivery by the Purchaser of the Transaction Documents or the performance of and compliance by the Purchaser with all of the provisions thereof and the consummation of the transactions contemplated therein, except the entry of the APA Approval Order, the Disclosure Statement Order (to the extent required in accordance with Section 7.5 hereof), and the Confirmation Order, and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h), 6006(d) and 3020(e), as applicable.

6.6    Arm's-Length.  The Purchaser acknowledges and agrees that the Company is acting solely in the capacity of an arm's-length contractual counterparty to the Purchaser with respect to the transactions contemplated by the Transaction Documents.  Additionally, the Purchaser is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in the Transaction Documents.  The Purchaser shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated by the Transaction Documents.

6.7    No Broker's Fees.  The Purchaser is not a party to any contract, agreement or understanding with any Person that would give rise to a valid claim against the Company for a brokerage commission.

6.8    Assignment of Option Agreement.  The Purchaser represents that it is a permitted assignee of the Option Agreement pursuant to the terms of Section 12 of the Option Agreement and will provide the Company with the Assignment and Assumption of Option Agreement on or before the earlier of (i) the delivery of the Herald Square Assignment Agreement to the Purchaser pursuant to Section 11.2 hereof and (ii) the Closing Date.

**Section 7.    Covenants.**  From and after the date hereof, until the earlier of the Closing Date or the effective date of any termination pursuant to Section 10 hereof:

7.1    Chapter 11 Case.  The Company shall file the Chapter 11 Case in the Bankruptcy Court for the Southern District of New York.

7.2    APA Approval Motion and APA Approval Order.  On the Petition Date, the Company shall authorize, execute and file with the Bankruptcy Court the APA Approval Motion seeking the entry of the APA Approval Order.  The Company agrees that it shall use commercially reasonable efforts to (i) obtain a waiver of Bankruptcy Rules 6004(h) and 6006(d) and request that the APA Approval Order be effective immediately upon its entry by the Bankruptcy Court, which APA Approval Order shall be consistent with this Agreement and the transactions contemplated herein and shall not be materially revised, modified, or amended by the Confirmation Order or any other further order of this Bankruptcy Court without the consent of the Purchaser in its reasonable discretion, (ii) fully support the APA Approval Motion, and any application seeking Bankruptcy Court approval and authorization to pay the Transaction Expenses as an administrative expense of the estate, including, but not limited to, filing supporting affidavits on behalf of the Company and providing the testimony of the affiants if needed, (iii) obtain approval of the APA Approval Order as soon as practicable following the filing of the APA Approval Motion and (iv) cause the APA Approval Order to become a Final Order as soon as practicable following the filing of the APA Approval Motion.

7.3    Plan and Disclosure Statement.  On the Petition Date, the Company shall authorize, execute and file with the Bankruptcy Court the Plan and seek entry of the Confirmation Order as soon as practicable.  The Company agrees that it shall support the Plan and use commercially reasonable efforts to obtain confirmation of the Plan as soon as practicable, complete the transactions contemplated under the Transaction Documents, and shall not consent to, or otherwise directly or indirectly support any restructuring or reorganization or

19

liquidation plan for the Company that is inconsistent with this Agreement (except as contemplated by and in accordance with Sections 7.11 and 10.3(b) of this Agreement) or the Plan. Any amendments, changes or modifications to the Plan (including modifications pursuant to Section 7.5 hereof) must be mutually satisfactory to the Company and the Purchaser, each acting reasonably.

7.4    <u>Confirmation Order</u>.  The Company shall file the Confirmation Order and use commercially reasonable efforts to cause the Confirmation Order to be entered and become a Final Order as soon as practicable after the Petition Date.  Any amendments, changes or modifications to the Confirmation Order must be mutually satisfactory to the Company and the Purchaser, each acting reasonably.

7.5    <u>Pro-Rata Plan</u>.  Immediately following the Non-Governmental Claims Bar Date, the Company shall use commercially reasonable efforts to review all Claims filed and, as soon as reasonably practicable, object to or otherwise seek to disallow all Claims that in its reasonable judgment should be disallowed or dismissed.  Following the Non-Governmental Bar Date, but prior to the earlier of November 30, 2012 and the date scheduled by the Bankruptcy Court for the hearing to consider confirmation of the Plan, the Company and the Purchaser shall jointly determine, or, if the Company and the Purchaser are unable to agree, the Bankruptcy Court shall determine, whether the total amount of allowed and disputed Claims (including administrative expenses) against the Company that may be satisfied pursuant to the Plan, including any required reserves in amounts sufficient to pay all disputed Claims in full, will exceed the amount of the Proceeds.  If the Company and the Purchaser or the Bankruptcy Court, as applicable, makes a determination that the allowed and disputed Claims (including administrative expenses) will exceed the amount of the Proceeds, the Purchaser and any Shareholder may elect (each as determined in their sole and absolute discretion), which election must be made within five (5) Business Days of such final determination as to the adequacy of the Proceeds, to commit to pay to the Company additional funds such that the total amount received by the Company is sufficient to pay all allowed Claims against the Company, including the funding of required reserves, in full.  If neither the Purchaser nor any Shareholder elects to provide additional funds as set forth herein, then the Purchaser shall be deemed to consent to modification of the Plan to provide for a pro rata sharing of the Proceeds among holders of allowed Claims against the Company and be subject to solicitation of and voting by impaired holders of such Claims.  In the event that the Purchaser is deemed to consent to the modification of the Plan under which holders of Claims will be impaired as set forth herein, the Company shall modify the Plan in accordance with this Agreement and shall seek confirmation of the modified Plan as soon as reasonably practicable and in accordance with this Agreement.  If either the Purchaser or the Shareholder fund any required reserve as provided in this Section 7.5, and funds remain in the reserve following satisfaction or disallowance of all Claims, such remaining funds shall be returned to the party that funded the required reserves.  If both the Purchaser and the Shareholder together fund any required reserve and funds remain in the reserve following satisfaction or disallowance of all Claims, such remaining funds shall be returned to the Shareholder and the Purchaser proportionately based on the amount so funded by each party.

7.6    <u>Conduct of Business/Liquidation</u>.  During the period from the date of this Agreement to the Closing Date, the Company shall diligently pursue and use commercially

reasonable efforts to complete as soon as practicable a liquidation of the Company's stores subject to the Purchased Leases (the "Liquidation") according to the terms set forth in the Liquidator Motion and consistent with the terms of this Agreement.

7.7    Further Assurances.  After the entry of the Confirmation Order and from time to time before and following the Closing, each party hereto shall, at the request of any other party hereto and without further conditions or consideration, take such other actions and execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, as such other party may reasonably request in order to more effectively consummate the transactions contemplated by the Transaction Documents, and assure fully to the Purchaser that all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Purchaser are conveyed to the Purchaser, all in accordance with and subject to the terms and conditions of the Transaction Documents, including, using commercially reasonable efforts to cause the satisfaction of all conditions to the other party's conditions to Closing that are in such party's control to occur. Without limiting the generality of the foregoing, the Company shall cause its officers, employees, agents and representatives to, use commercially reasonable efforts to obtain any third party consents as shall be required to be obtained in connection with the consummation of the transactions contemplated by the Transaction Documents.

7.8    Access to Information.  Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall afford the Purchaser and its representatives reasonable access at reasonable times and during normal business hours, and with prior notice to the Company, throughout the period prior to the Closing Date, to its employees, consultants, properties, books, contracts and records and, during such period, the Company shall furnish promptly to the Purchaser all information concerning the Purchased Assets as may be requested by the Purchaser; provided that such access shall not be unreasonably disruptive to the Company.  All access pursuant to this Section 7.8 shall be coordinated through an officer of the Company.  Purchaser will not contact directly any of the Company's non-officer employees, consultants, customers or suppliers without the prior written consent of the Company (which consent may be given or withheld in the Company's reasonable discretion).

7.9    Notices.  Between the date hereof and the Closing Date, each party shall give prompt written notice to the other parties hereto of (i) the occurrence, or failure to occur, of any event of which such party is aware which occurrence or failure would be likely to cause (a) any representation or warranty of such party contained in this Agreement to be untrue or inaccurate in any material respect, (b) any covenant of such party contained in this Agreement not to be satisfied or (c) any condition precedent contained in the Transaction Documents not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Transaction Documents, (iii) any notice or other communication from any governmental entity in connection with the transactions contemplated by the Transaction Documents, (iv) any action commenced or, to the knowledge of such party, threatened, relating to or involving or otherwise affecting such party or the transactions contemplated by the Transaction Documents, and (v) any failure of any such party to comply, in any material respect, with or satisfy any

covenant, condition or agreement to be complied with or satisfied by it under the Transaction Documents.

7.10    Support by Parties.  Except as otherwise provided for in Section 7.11, the Company, the Shareholders and the Purchaser agree that they shall not consent to, or otherwise directly or indirectly support any restructuring or reorganization or liquidation plan for the Company that is inconsistent with this Agreement or the Plan.

7.11    Alternate Transactions.  Without the prior written consent of the Purchaser, prior to the Closing neither the Company nor any Shareholder shall solicit, initiate or take any action to facilitate or encourage any offers, inquiries, discussions or proposals from, disclose information to (except as required by the Bankruptcy Court or under the Bankruptcy Code), afford any access to, negotiate or participate in any discussions with, enter into any agreement or arrangement with, or otherwise assist, any Person other than the Purchaser and its Affiliates and advisers in connection with a potential Alternate Transaction, and the Company and the Shareholders shall cause their respective representatives and Affiliates, and their Affiliates' respective officers, employees, directors, investment bankers, agents and representatives to refrain from any of the foregoing.  The Company and the Shareholders shall, and shall cause their respective representatives and Affiliates, and their Affiliates' respective officers, employees, directors, investment bankers, agents and representatives to immediately cease any discussions they are currently engaging in with any other Persons with respect to any Alternate Transaction.  In the event that the Company, the Shareholders, or any of their respective representatives or Affiliates, or their Affiliates' respective officers, employees, directors, investment bankers, agents and representatives receive any such inquiry or proposal or request for information, or any such negotiations or discussions are sought to be initiated or continued, the Company and the applicable Shareholder (if any) shall promptly (and in any event within two (2) Business Days) provide the Purchaser with written notice thereof, which notice shall include a summary of the material terms of such proposal or offer, including the nature and the terms of any of the foregoing and the identity of the parties involved.  Notwithstanding anything herein to the contrary, if, following the Petition Date, in the exercise of its fiduciary duties, the board of directors of the Company determines that such inquiry or proposal may result in a greater recovery to holders of allowed Claims, then the Company, the Shareholders, and their respective Affiliates may engage or participate in any discussions or negotiations with any Person who has made such an inquiry or proposal and may seek authorization from the Bankruptcy Court to enter into a binding commitment for an Alternate Transaction for the Company's assets that would provide a greater recovery to holders of allowed Claims against the Company than contemplated hereby and in the Plan, and no later than five (5) Business Days prior to filing with the Bankruptcy Court a motion seeking authorization to enter into any binding commitments with respect to such transaction, the Company shall give notice to the Purchaser that such transaction, if so committed to, would give rise to a Company termination option pursuant to Section 10.3(b) hereof and thereafter negotiate with the Purchaser in good faith (to the extent that the Purchaser so desires) with respect to any changes proposed by the Purchaser to the terms of this Agreement.

7.12    Regulatory Filings. If the Company or the Purchaser determines a filing is or may be required under applicable law in connection with the transactions contemplated hereunder, the Company and the Purchaser shall use commercially reasonable efforts to promptly prepare

and file all necessary documentation and to effect all applications that are necessary or advisable under applicable law with respect to the transactions contemplated under the Transaction Documents so that any applicable waiting period shall have expired or been terminated as soon as practicable after the date hereof.  Each party shall use commercially reasonable efforts to cooperate with the other party in connection with any such filing.

7.13    Bulk Sales.  The Company shall cooperate with the Purchaser in connection with any bulk sales notifications that Purchaser may seek to file pursuant to section 1141(c) of the New York State Tax Code, 11-1111(c) of the New York City Administrative Code, or any similar provisions of other jurisdictions where Purchased Assets are located or the Company does business.  Except as provided in the Plan, Confirmation Order or another order of the Bankruptcy Court, the Purchaser shall be entitled to withhold from the Purchase Price any amount that New York State, New York City or any other jurisdiction notifies the Purchaser is required to be withheld in response to such bulk sales filing.  The amount withheld by the Purchaser shall be retained in escrow and thereafter be paid over to the relevant jurisdiction (or its taxing authority) or released to the Company, in each case when and to the extent determined by such  jurisdiction (or its taxing authority) pursuant to its bulk sale procedures.

7.14    Use of Name.  As promptly as practicable (and in any event within ten (10) Business Days) following the Closing, the Shareholders shall cause the Company to, and the Company shall, (i) change its name to a name other than "Daffy's" (or any similar or derivative name) and (ii) discontinue the use of the name "Daffy's", any similar or derivative name, or any other Purchased Intellectual Property, including on any signage, marketing materials, documents, agreement, letterhead or otherwise; except that the Daffy's Charitable Foundation shall continue to have the right to use the "Daffy's" name pursuant to a mutually agreeable perpetual, royalty-free license agreement to be put in place between the Purchaser and the Daffy's Charitable Foundation.

7.15    Restriction on Transfer of Equity Interests.  Prior to the Closing or until this Agreement is terminated in accordance with its terms, the Shareholders shall not (i) directly or indirectly sell, pledge, dispose of or cause any Lien to exist on any of the Equity Interests, or (ii) solicit, encourage or facilitate any inquires, discussions or proposals regarding, continue or enter into discussions or negotiations with respect to, or enter into or consummate any agreement or understanding in connection with any proposal regarding, the sale, pledge, disposition or creation of any Lien on any of the Equity Interests, and the Shareholders shall cause their respective representatives and Affiliates, and their respective Affiliates' respective officers, employees, directors, investment bankers, agents and representatives to refrain from any of the foregoing.  In the event that any Shareholder or any of such Shareholders' representatives or Affiliates receive any such inquiry or proposal or request for information, or any such negotiations or discussions are sought to be initiated or continued, such Shareholder shall promptly (and in any event within two (2) Business Days) provide the Purchaser with written notice thereof, which notice shall include a summary of the material terms of such proposal or offer, including the nature and the terms of any of the foregoing and the identity of the Persons involved.

7.16    Adequate Assurance of Future Performance.  The Purchaser shall take such actions as are reasonably required to obtain a finding by the Bankruptcy Court that the

23

Purchaser, or any designee or designees of the Purchaser pursuant to Section 2.2(c) hereof, has the necessary qualifications to show adequate assurance of future performance with respect to the Purchased Leases as required by Sections 365(b) and 365(f) of the Bankruptcy Code.

7.17    Employee Obligations.  If the Shareholders elect, in their sole discretion, to provide any long-term employees or officers of the Company with any bonus, severance or termination payment in consideration for services rendered to the Company that the Company is not contractually or legally required to provide (each, a "Voluntary Compensation Payment"), in no event shall such Voluntary Compensation Payment be or become an obligation or Liability of the Company and the Shareholders shall be responsible for funding (either by making a contribution to the capital of the Company or paying such amount directly to any Governmental Authority),  the payment of, and shall indemnify the Company and hold the Company harmless from and against any and all Liabilities and obligations for, employment or other taxes or amounts imposed on the Company by any Governmental Authority relating to the Voluntary Compensation Payments, provided, however, that notwithstanding the foregoing, any Voluntary Compensation Payment which is made after, and any tax or other amount imposed on the Company by any Governmental Authority relating to a Voluntary Compensation Payment which is due after, the Governmental Claims Bar Date, may be made out of the Company's funds only after such time as the Company is permitted to make distributions to Shareholders under the Plan and, in such event, the Shareholders shall have no obligation with respect thereto.

7.18    Shareholder Option Agreements.  The Company shall assume under the Plan any and all outstanding options for the purchase of Equity Interests.

7.19    Security Deposits/Letters of Credit.  Except as otherwise provided in Section 2.2(h) hereof, from and after the date hereof, neither the Company nor any Shareholder shall take any action to take possession of, cancel, extinguish or otherwise affect any outstanding letters of credit held by landlords under any of the Purchased Leases.  The security deposits held by the landlords under the VIM Leases, however, may be returned to the Company on the Closing Date.

7.20    Insurance.  From the date hereof until the Closing, the Company shall maintain all insurance policies required pursuant to and in accordance with the Purchased Leases.  If, prior to Closing, any of the premises subject to a Purchased Lease (or any part thereof) shall be the subject of a casualty, the Company shall notify the Purchaser of same.  In such event, upon the assumption and assignment of any such Purchased Lease, the Company shall assign to the Purchaser all of its right and interest in and to any insurance proceeds arising from any casualty on the premises subject to the Purchased Lease.

**Section 8.**      **Conditions to Closing**.

8.1      <u>Conditions to Obligations of Purchaser</u>. The obligations of the Purchaser hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction of each of the following conditions, any of which may be waived by the Purchaser in its sole and absolute discretion:

(a)      <u>APA Approval Order</u>.  The APA Approval Order shall be a Final Order.

(b)      <u>Confirmation Order</u>.  The Confirmation Order shall be a Final Order unless waived by the Purchaser after reasonable consideration of the merits of any filed appeal, unless the Herald Square Lease has been assigned to the Purchaser pursuant to Section 11.2 hereof, in which case, the Confirmation Order shall be entered by the Bankruptcy Court and not be subject to a stay.

(c)      <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the effective date of the Plan shall have been satisfied or waived by the Company and the Purchaser in accordance with the Plan, and the Plan has become effective.

(d)      <u>Alternate Transaction</u>.  The Company shall not have entered into any binding commitments with respect to an Alternate Transaction.

(e)      <u>Deliverables</u>.  The Company and the Shareholders shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Sections 9.1 and 9.2 hereof, respectively.

(f)      <u>Condition of Premises</u>.  The Company's stores that are subject to the Purchased Leases are free and clear of all rights of occupancy (other than pursuant to the Purchased Leases), vacant, in broom clean condition and otherwise in "as is" condition.

(g)      <u>Consents</u>.  All other material governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by the Transaction Documents shall have been made or received and remain in effect and there shall not be any order of any governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

(h)      <u>Representations and Warranties</u>. (i) The representations and warranties of the Company contained in the last sentence of Section 4.10, the fourth sentence of Section 4.11 and the last sentence of Section 4.12 hereof shall be true and correct in all respects as of the date hereof and at and as of the Closing Date with the same force and effect as if made at and as of such date (or, in the case of any such representations and warranties made as of a specific date, as of such date), and (ii) (A) all other representations and warranties of the Company contained in Section 4 hereof and (B) the representations and warranties of each Shareholder contained in Section 5 hereof, in each case shall be true and correct (without giving effect to any limitations as to materiality or Material Adverse Change set forth therein) as of the date hereof and at and as of the Closing Date with the same force and effect as if made at and as of such date (or, in the case of any such representations and warranties made as of a specific date, as of such date),

25

except, solely with respect to clause (ii) of this subsection, where such failures to be true and correct in the aggregate are not reasonably likely to result in a Material Adverse Change.

(i)   Covenants.  (A) The Company shall have performed and complied in all material respects with all of its covenants and agreements contained in the Transaction Documents through the Closing Date and (B) each Shareholder shall have performed and complied in all material respects with all of its covenants and agreements contained in the Transaction Documents through the Closing Date.

(j)   Regulatory Filing.  Any filing required under applicable law in connection with the transactions contemplated under the Transaction Documents and all necessary documentation or applications required in connection with any such filing shall have been filed by the Company and any applicable waiting period shall have expired or been terminated.

(k)   Material Adverse Change.  No Material Adverse Change shall have occurred since the date hereof.

(l)   Cure Costs.  The Company has paid any and all Cure Costs for the Purchased Leases contemplated hereunder.

8.2   Conditions Precedent to Obligations of Company.  The obligations of the Company hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction of each of the following conditions, any of which may be waived by the Company in its sole and absolute discretion:

(a)   Deposit.  The Purchaser shall have funded the Deposit with the letter of credit.

(b)   Confirmation Order.  The Confirmation Order shall be a Final Order unless waived by the Company after reasonable consideration of the merits of any filed appeal, unless the Herald Square Lease has been assigned to the Purchaser pursuant to Section 11.2 hereof, in which case, the Confirmation Order shall be entered by the Bankruptcy Court and not be subject to a stay.

(c)   Conditions to Effective Date.  The conditions to the occurrence of the effective date of the Plan shall have been satisfied or waived by the Company and the Purchaser in accordance with the Plan and the Plan has become effective.

(d)   Consents.  All other material governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by the Transaction Documents shall have been made or received and remain in effect and there shall not be any order of governmental body of competent jurisdiction restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby.

(e)   Representations and Warranties.  The representations and warranties of the Purchaser contained in Section 6 hereof shall be true and correct in all respects (without giving effect to any limitations as to materiality set forth therein) as of the date hereof and at and as of

the Closing Date with the same force and effect as if made at and as of such date (or, in the case of representations and warranties made as of a specific date, as of such date), except where such failures to be true and correct in the aggregate are not reasonably likely to have or result in an adverse impact on the ability of the Purchaser to perform its obligations as set forth in the Transaction Documents.

(f)     <u>Covenants</u>.  The Purchaser shall have performed and complied in all material respects with all of its covenants and agreements contained in the Transaction Documents through the Closing Date.

(g)     <u>Closing Deliverables</u>.  The Purchaser shall have delivered, or caused to be delivered, to the Company all of the items set forth in Section 9.3 hereof.

(h)     <u>Regulatory Filing</u>.  Any filing required under applicable law in connection with the transactions contemplated under the Transaction Documents and all necessary documentation or applications required in connection with any such filing shall have been filed by the Purchaser and any applicable waiting period shall have expired or been terminated.

**Section 9.     <u>Closing</u>**.  The closing (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP, in New York, New York, on the Closing Date.  The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date and all documents and instruments shall be deemed to have been delivered simultaneously at such time.

9.1     At the Closing, the Company shall deliver to the Purchaser the following:

(a)     A certificate of the Company to the effect that the conditions set forth in Sections 8.1(h)(i), 8.1(h)(ii)(A) and 8.1(i)(A) have been satisfied;

(b)     A copy of the Confirmation Order;

(c)     Executed copies of the Transaction Documents to which it is a party;

(d)     Subject to Section 2.2(g), an Assignment and Assumption of Lease Agreement for each of the Purchased Leases executed by the Company in the form attached hereto as Exhibit B or as otherwise approved by the Purchaser in its reasonable discretion;

(e)     A Bill of Sale for the Purchased Fixtures executed by the Company in the form attached hereto as Exhibit C or as otherwise approved by the Purchaser in its reasonable discretion;

(f)     An IP Assignment Agreement executed by the Company in the form attached hereto as Exhibit D or as otherwise approved by the Purchaser in its reasonable discretion;

(g)     A certificate completed pursuant to Treasury Regulation Section 1.1445–2(b) stating that the Company is not a foreign person within the meaning of Section 1445(f)(3) of the United States Tax Code;

(h)    All documents necessary to effectuate the assignment(s), if any, set forth in Section 7.20 hereof.

9.2    At the Closing, each Shareholder shall deliver or cause to be delivered to the Purchaser executed copies of the Transaction Documents to which such Shareholder is a party.

9.3    At the Closing, the Purchaser shall deliver or cause to be delivered to the Company the following:

(a)    Payment of the Purchase Price, provided, that the Deposit shall be applied against the Purchase Price as set forth in and in accordance with this Agreement;

(b)    A certificate of the Purchaser to the effect that the conditions set forth in 8.2(e) and 8.2(f) have been satisfied;

(c)    Executed copies of the Transaction Documents to which it is a party;

(d)    To the extent not previously delivered, the Assignment and Assumption of Option Agreement; and

(e)    Letters of Credit.  The Purchaser (i) shall have delivered to the landlord under the 18th Street Lease a replacement letter of credit and the existing letter of credit in respect of the 18th Street Lease shall have been returned to the Company or (ii) shall have delivered to the Company for delivery to the issuing bank a backstop letter of credit or cash as required under Section 2.2(h) hereunder.

9.4    At the Closing, the Company shall file or cause to be filed any New York State and City real property transfer tax returns required to be filed in connection with the transfer or assignment of the Purchased Assets pursuant to the Transaction Documents, and, except as provided in Section 2.8(b) hereof, shall pay any tax shown due on such tax returns.  Purchaser shall reimburse the Company for its share of the Transfer Taxes pursuant to Section 2.8(b) hereof within ten (10) days of the transfer of the Herald Square Lease to the Purchaser.

**Section 10.    Termination**.

10.1    Termination by Mutual Consent.  This Agreement may be terminated at any time prior to the Closing Date upon the mutual written consent of the Company and the Purchaser.

10.2    Termination by the Purchaser.  Prior to the Closing Date, the Purchaser may terminate this Agreement upon written notice to the Company of the occurrence of any of the following events, at which time the commitment of the Purchaser to purchase the Purchased Assets as set forth in this Agreement shall terminate and all of the obligations of the Company (other than the obligations of the Company set forth in Section 10.4 hereof) shall be of no further force or effect:

(a)    the Petition Date has not occurred on or before August 31, 2012 or such later date as may be agreed to by the Purchaser in its reasonable discretion;

28

(b)    the Closing Date does not occur on or before December 31, 2012 or, in the case of a pro rata plan in accordance with Section 7.5 hereof, on or before April 1, 2013, or, in either case, such later date as may be agreed to by the Purchaser in its reasonable discretion;

(c)    one or more of the conditions precedent to occurrence of the Closing or to the obligations of the Purchaser set forth in this Agreement becomes impossible to satisfy;

(d)    at any time after the occurrence of a Material Adverse Change;

(e)    the withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement (to the extent required in accordance with Section 7.5) or any document related to the Plan or Disclosure Statement (as applicable) (including any documents in the supplement to the Plan, any motion, notice, exhibit, appendix or order) by the Company or any Shareholder, which withdrawal, amendment, modification or filing is materially inconsistent with this Agreement, except as agreed to in writing by the Purchaser;

(f)    the filing by the Company or any Shareholder of any motion or other request for relief seeking (i) to voluntarily dismiss the Chapter 11 Case, (ii) conversion of the Chapter 11 Case to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or examiner pursuant to Section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(g)    the entry of an order by the Bankruptcy Court (i) dismissing the Chapter 11 Case, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing a trustee or examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(h)    if there shall have been any breach by the Company or any Shareholder of any of their respective representations, warranties, covenants and agreements set forth herein, which breach (i) has rendered impossible the satisfaction of any of the conditions set forth in Section 8.1 hereof or (ii) has not been remedied within five (5) Business Days after the Purchaser delivers written notice of such breach to the Company or any Shareholder, as applicable; provided, that Purchaser shall not have materially breached its obligations under this Agreement prior to the occurrence of the event upon which termination under this clause 10.2(h) is based; or

(i)    the Company or any Shareholder withdraws or revokes the Plan, files, propounds or otherwise supports any plan of reorganization or liquidation other than the Plan, abandons the Plan and the pursuit of confirmation thereof, or files any motion or pleading with the Bankruptcy Court that is materially inconsistent in any respect with this Agreement or the Plan.

10.3    <u>Termination by the Company</u>.  Prior to the Closing Date, the Company may terminate this Agreement upon written notice to the Purchaser of the occurrence of any of the following events, at which time the commitment of the Purchaser to purchase the Purchased Assets as set forth in this Agreement shall terminate and all of the obligations of the Company (other than the obligations of the Company set forth in Section 10.4 hereof) shall be of no further force or effect:

29

(a)    if there shall have been any breach by the Purchaser of any of its representations, warranties, covenants and agreements set forth herein, which breach (i) has rendered impossible the satisfaction of any of the conditions set forth in Section 8.2 hereof or (ii) has not been remedied within five (5) Business Days after the Company delivers written notice of such breach to the Purchaser, provided, that neither the Company nor any Shareholder shall have materially breached its obligations under this Agreement prior to the occurrence of the event upon which termination under this clause 10.3(a) is based;

(b)    if, after the Petition Date, in the exercise of its fiduciary duties by the board of directors of the Company, the Company determines to pursue an Alternate Transaction based on the board of directors determination that such Alternate Transaction will provide a greater recovery to holders of allowed Claims against the Company and is not inconsistent with the Company's obligations under Section 10.4 in the event of a termination of this Agreement and, after complying with Section 7.11 hereof, the Company enters into a binding commitment with respect to such Alternate Transaction;

(c)    the Closing Date does not occur on or before December 31, 2012 or, in the case of a pro rata plan in accordance with Section 7.5 hereof, on or before April 1, 2013, or, in either case, such later date as may be agreed to by the Company in its reasonable discretion; and

(d)    one or more conditions precedent to the occurrence of the Closing or to the obligations of the Company set forth in this Agreement becomes impossible to satisfy.

10.4    Consequences of Termination.

(a)    Upon termination of this Agreement by the Purchaser pursuant to Section 10.2 or the Company pursuant to Section 10.3(d) hereof (provided that the inability to satisfy a condition precedent to the occurrence of the Closing was not caused by a breach by the Purchaser as set forth in 10.3(a) hereof):

(i)    provided that the Herald Square Lease has not been assigned to the Purchaser pursuant to Section 11.2 hereof, the Company shall assume and assign the Herald Square Lease to the Purchaser in accordance with the terms and conditions of Section 11 hereof; and

(ii)    if such termination is by the Purchaser pursuant to Section 10.2(h) hereof, the Purchaser shall be entitled to seek any and all damages and remedies available to the Purchaser at law or in equity.

(b)    Upon a termination of this Agreement by the Company pursuant to Section 10.3(b) hereof:

(i)    provided that the Herald Square Lease has not been assigned to the Purchaser pursuant to Section 11.2 hereof, the Company shall assume and assign the Herald Square Lease to the Purchaser in accordance with the terms and conditions of Section 11 hereof; and

30

(ii)    subject to Section 10.4(d) hereof, the Company shall pay the Transaction Expenses to the Purchaser in cash (A) to the extent that the Company has adequate cash to pay the Transaction Expenses as of the date of such termination by the Company, as soon as practicable following the close of business on the next Business Day following the date of such termination or (B) to the extent that the Company does not have adequate cash to pay the Transaction Expenses as of the date of such termination by the Company, on the next business day following consummation of an Alternate Transaction.

(c)    Upon the termination of this Agreement for any reason whatsoever (other than by the Company pursuant to Section 10.3(a) hereof), the Deposit and the letter of credit evidencing the Deposit shall be returned to the Purchaser within two (2) Business Days following such termination.  Upon the termination of this Agreement by the Company pursuant to Section 10.3(a) hereof, the Company shall be entitled to draw on the letter of credit evidencing the Deposit and the Deposit shall be paid to the Company, and the Option Agreement shall terminate, the Purchaser's right to the Herald Square Lease shall terminate and all rights of the Purchaser's Affiliates in and to the Herald Square Lease (other than as lessor with respect thereto) shall terminate without liability to the Company.

(d)    If this Agreement is terminated by the Company pursuant to Section 10.3(b), provided that the Herald Square Lease has not yet been assigned to the Purchaser pursuant to Section 11.2 hereof, the Transaction Expenses shall be credited against the Herald Square Payment and shall reduce dollar for dollar the amount of the Herald Square Payment to be paid by the Purchaser under Section 11 hereof.

**Section 11.**    Herald Square Lease Assignment.

11.1    Upon a termination of this Agreement pursuant to Sections 10.2, 10.3(b) or 10.3(d), and in accordance with Section 10.4(d) hereof:

(a)    upon payment of the Herald Square Payment and delivery of the Assignment and Assumption of Option Agreement by the Purchaser and without any further action or approval of or by the Bankruptcy Court, the Company shall deliver an executed copy of the Herald Square Assignment Agreement, which agreement shall immediately become effective pursuant to the terms of the APA Approval Order, and the Herald Square Lease shall be assumed, assigned and delivered by the Company to the Purchaser;

(b)    the Company shall, as soon as practicable after delivery of the Herald Square Assignment Agreement and following the completion of the Liquidation, but in no event later than November 30, 2012, deliver the Herald Square Premises to the Purchaser, free and clear of all rights of occupancy, vacant, broom clean, and otherwise in "as is" condition; and

(c)    the Company shall pay any and all Cure Costs for the Herald Square Lease.

31

11.2    Immediately upon written notice by the Purchaser to the Company delivered on or before November 25, 2012,

(a)    upon payment of the Herald Square Payment and delivery of the Assignment and Assumption of Option Agreement by the Purchaser and without any further action or approval of or by the Bankruptcy Court, the Company shall deliver an executed copy of the Herald Square Assignment Agreement, which agreement shall immediately become effective pursuant to the terms of the APA Approval Order, and the Herald Square Lease shall be assumed, assigned and delivered by the Company to the Purchaser;

(b)    the Company shall, as soon as practicable after delivery of the Herald Square Assignment Agreement and following the completion of the Liquidation, but in no event later than November 30, 2012, deliver the Herald Square Premises to the Purchaser, free and clear of all rights of occupancy, vacant, broom clean, and otherwise in "as is" condition; and

(c)    the Company shall pay any and all Cure Costs for the Herald Square Lease.

11.3    If the Herald Square Lease is assigned pursuant to Section 11.2 hereof, and the Closing Date occurs effectuating the transactions contemplated hereby, the Purchase Price for the remaining Purchased Assets (excluding the Herald Square Lease) shall be reduced dollar for dollar by the amount of the Herald Square Payment.

**Section 12.    No Survival.**

12.1    The representations and warranties of the Company, the Shareholders and the Purchaser contained in this Agreement or in any certificate delivered hereunder shall not survive the Closing hereunder.

**Section 13.    Notices.**

13.1    All notices, communications and deliveries required or permitted by this Agreement shall be made in writing signed by the party making the same, shall specify the Section of this Agreement pursuant to which it is given or being made and shall be deemed given or made (a) on the date delivered if delivered by telecopy or other standard form of written telecommunication (e.g. e-mail) and confirmed by receipt of electronic confirmation or other evidence of receipt, (b) on the date delivered, if delivered in person, (c) on the third (3rd) Business Day after it is mailed if mailed by registered or certified mail (return receipt requested) (with postage and other fees prepaid) or (d) on the day after it is delivered, prepaid, by an overnight express delivery service that confirms to the sender delivery on such day, as follows:

(1)    if to the Purchaser, at:

Jericho Acquisitions I LLC
150 Broadway
Suite 800
New York, NY 10038
Attn:   Mr. Morris Bailey

██████████████████████

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attn: Brad Eric Scheler, Esq.
Email: Brad.Eric.Scheler@friedfrank.com
Fax: (212) 859-4000

(2)     if to the Company, at:

Daffy's, Inc.
One Daffy's Way
Secaucus, New Jersey 07094
Attn: Ms. Marcia Wilson
Email: ██████████████

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Andrea Bernstein, Esq.
Email: andrea.bernstein@weil.com
Fax: (212) 310-8007

(3)     if to Marcia Wilson or any other shareholder, at

Ms. Marcia Wilson
c/o Beattie Padovano, LLC
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645-0244
Attn: Dana B. Cobb, Esq.
Email: dcobb@beattielaw.com
Fax: (201) 573-9736

with a copy to (which shall not constitute notice):

 Beattie Padovano, LLC
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645-0244
Attn: Dana B. Cobb, Esq
Email: dcobb@beattielaw.com
Fax: (201) 573-9736

33

**Section 14.**    **Assignment**.  This Agreement shall be binding upon, and shall inure to the benefit of and be enforceable by, the parties hereto and their respective successors and assigns.  This Agreement is not assignable, in whole or in part; provided, however, that the Purchaser may assign all or any portion of its obligations hereunder to one or more of its Affiliates and the Company may collaterally assign its rights under this Agreement to its lenders.  Upon any assignment, the obligations of the Purchaser in respect of the portion of its obligations so assigned shall not terminate.

**Section 15.**    **Entire Agreement**.  This Agreement, including the agreements and documents accompanying this Agreement or attached as exhibits to and the documents and instruments referred to in this Agreement, constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties shall continue in full force and effect.

**Section 16.**    **Governing Law, Venue**.  THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE PURCHASER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS*.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

**Section 17.**    **Waivers and Amendments**.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor shall any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.  Notwithstanding anything to the contrary in this Agreement, no amendment that increases the Purchaser's obligations with respect to the Purchased Assets shall be effective against the Purchaser without the Purchaser's consent.

34

### Section 18.    **Miscellaneous.**

18.1    Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18.2    Headings.  The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of this Agreement.

18.3    Compliance with the Bankruptcy Code.  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be inconsistent with the applicable provisions of the Bankruptcy Code and any orders of the Bankruptcy Court.

18.4    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstances is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid, void or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effectuate the original intent of the parties.

18.5    Specific Performance.  The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions without the necessity of posting bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

18.6    Interpretation and Construction.  This Agreement has been freely and fairly negotiated among the parties hereto. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  Unless the context requires otherwise, any agreements, documents, instruments or laws defined or referred to in this Agreement will be deemed to mean or refer to such agreements, documents, instruments or laws as from time to time amended, modified or supplemented, including (a) in the case of agreements, documents or instruments, by waiver or consent and (b) in the case of laws, by succession of comparable successor statutes.  All references in this Agreement to any particular law will be deemed to refer also to any rules and regulations promulgated under that law.  The words "include," "includes" and "including" will be deemed to be followed by "without limitation." The word

35

"or" is used in the inclusive sense of "and/or" unless the context requires otherwise. References to a Person are also to its permitted successors and assigns. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context requires otherwise. When a reference in this Agreement is made to an Article, Section, Exhibit, Annex or Schedule, such reference is to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement unless otherwise indicated.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. For all purposes of this Agreement, "Company" shall include the debtor in the Chapter 11 Case, and the reorganized debtor following the effective date of the Plan and the "Purchaser" shall include any of the Purchaser's members and/or Affiliates.


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date first above written.

DAFFY'S, INC.
By: _____
Name:
Title:

JERICHO ACQUISITIONS I LLC
By: _____
Name:
Title:


_____
MARCIA WILSON


THE WILSON 2003 FAMILY TRUST


By:_____
        Marcia Wilson, Trustee

[Signature Page to Asset Purchase, Assignment and Support Agreement]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date first above written.

DAFFY'S, INC

By: _____

Name: _____

Title: _____

JERICHO ACQUISITIONS I LLC

By: _____

Name: _____

Title: _____

_____
MARCIA WILSON

THE WILSON 2003 FAMILY TRUST

By: _____
      Marcia Wilson, Trustee

**Exhibit A**

**Herald Square Assignment Agreement**

**ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT**

DAFFY'S, INC., a New Jersey corporation ("Assignor"), in consideration of the Herald Square Payment and other good and valuable consideration paid by [_____] ("Assignee"), hereby assigns, transfers, conveys and sets over unto Assignee, effective as of the date below, all of Assignor's right, title and interest as tenant in, to and under that certain lease agreement between Herald Center Department Store of New York, LLC, as successor-in-interest to Herald Center Department Store, L.P., and Assignor, dated September 2, 1993, and all amendments or modifications thereto (the "Lease"), and the premises demised under the Lease (the "Demised Premises"), together with all of the appurtenant rights and easements thereby demised, and all of Assignor's right, title and interest in and to all Fixtures located in or on the Demised Premises, free and clear of all Liens and Claims.  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Asset Purchase, Assignment and Support Agreement (the "Purchase Agreement"), dated as of July 18, 2012, by and among the Assignor, Marcia Wilson, The Wilson 2003 Family Trust and the Assignee.

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns forever.

Assignor hereby sells, assigns, transfers, conveys and delivers, and Assignee hereby purchases, acquires, assumes and accepts, all of the Assignor's right, title and interest in, under and to the Lease, subject to the terms and conditions of, and in accordance with, the Purchase Agreement. This Assignment and Assumption of Lease Agreement is made in connection with that certain order of the Bankruptcy Court for the Southern District of New York, dated [_____], 2012, approving the Purchase Agreement and authorizing Assignor's entry into this Assumption and Assignment of Lease Agreement.

This Assignment and Assumption of Lease Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Lease Agreement as of _____, 2012.

WITNESS:                                    ASSIGNOR:

                                            DAFFY'S, INC.,
                                            a New Jersey corporation


_____            By:_____
Name:                                       Name:
                                            Title:



WITNESS:                                    ASSIGNEE:

                                            [_____],
                                            a [Delaware/New York limited liability
                                            company/corporation]]

                                            By:

_____            By:_____
Name:                                       Name:
                                            Title:

*[Signature Page to Herald Square Assignment Agreement]*

## ASSIGNOR ACKNOWLEDGMENT

**STATE OF** _____          )
                                         )  **SS:**
**COUNTY OF** _____          )

ON THIS _____ day of _____ 2012, before me, the subscriber, personally came _____ , to me known, who being by me duly sworn, did depose and say that she/he is _____ of Daffy's, Inc., a New Jersey corporation, the corporation described in and which executed the within instrument; that she/he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that she/he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
Notary Public

## ASSIGNEE ACKNOWLEDGMENT

**STATE OF** _____          )
                                         )  **SS:**
**COUNTY OF** _____          )

ON THIS _____ day of _____ 2012, before me, the subscriber, personally came _____ , to me known, who being by me duly sworn, did depose and say that he is _____ of the corporation described in and which executed the within instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
Notary Public

8634373

## Exhibit B

### Form of Assignment and Assumption of Lease Agreement

### ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

DAFFY'S, INC., a New Jersey corporation ("Assignor"), in consideration of [$_____] and other good and valuable consideration paid by [_____] ("Assignee"), hereby assigns, transfers, conveys and sets over unto Assignee, effective as of the date below all of Assignor's right, title and interest as tenant in, to and under that certain lease [DESCRIBE LEASE AND ALL AMENDMENTS] (the "Lease"), including all renewal options granted therein, and the premises demised under the Lease (the "Demised Premises"), together with all of the appurtenant rights and easements thereby demised, free and clear of all Liens and Claims.  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Asset Purchase, Assignment and Support Agreement (the "Purchase Agreement"), dated as of July 18, 2012, by and among the Assignor, Marcia Wilson, The Wilson 2003 Family Trust and the Assignee.

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns forever.

Assignor hereby sells, assigns, transfers, conveys and delivers, and Assignee hereby purchases, acquires, assumes and accepts, all of the Assignor's right, title and interest in, under and to the Lease, subject to the terms and conditions of, and in accordance with, the Purchase Agreement.
This Assignment and Assumption of Lease Agreement is made in connection with, and subject to the terms and conditions of the Purchase Agreement, Assignor's plan of liquidation under chapter 11 of title 11 of the United States Code (the "Plan") and that certain order of the Bankruptcy Court for the Southern District of New York confirming the Plan, dated [_____], 2012.

This Assignment and Assumption of Lease Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Lease Agreement as of _____, 2012.

WITNESS:                             ASSIGNOR:

                                     DAFFY'S, INC.,
                                     a New Jersey corporation


_____     By:_____
Name:                                Name:
                                     Title:


WITNESS:                             ASSIGNEE:

                                     [_____],
                                     a [Delaware/New York limited liability
                                     company/corporation]

                                     By:

_____     By:_____
Name:                                Name:
                                     Title:

*[Signature Page to Assignment and Assumption Agreement]*

## ASSIGNOR ACKNOWLEDGMENT

STATE OF _____            )
                                     )  **SS:**
COUNTY OF _____              )

ON THIS _____ day of _____ 2012, before me, the subscriber, personally came _____ , to me known, who being by me duly sworn, did depose and say that she/he is _____ of Daffy's, Inc., a New Jersey corporation, the corporation described in and which executed the within instrument; that she/he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that she/he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
Notary Public

## ASSIGNEE ACKNOWLEDGMENT

STATE OF _____            )
                                     )  **SS:**
COUNTY OF _____              )

ON THIS _____ day of _____ 2012, before me, the subscriber, personally came _____ , to me known, who being by me duly sworn, did depose and say that he is _____ of the corporation described in and which executed the within instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
Notary Public

8633203

**Exhibit C**

**Form of Bill of Sale**

**BILL OF SALE**

THIS BILL OF SALE (the "Bill of Sale") is executed and delivered this [___] day of [_____], 2012, by and between Daffy's Inc., a New Jersey corporation (the "Company") to Jericho Acquisitions I LLC, a Delaware limited liability company ("Purchaser").  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Asset Purchase, Assignment and Support Agreement (the "Purchase Agreement"), dated as of July 18, 2012, by and among the Company, Marcia Wilson, The Wilson 2003 Family Trust and the Purchaser.

WHEREAS, pursuant to the Purchase Agreement, in connection with the Plan and subject to Bankruptcy Court approval, the Company desires to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept such assignment and assume all of the Company's right, title and interest in and to all Purchased Fixtures all as more fully described in the Purchase Agreement; and

WHEREAS, on [_____], 2012 the Company commenced the Chapter 11 Case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York;

WHEREAS, on [_____], 2012 the Bankruptcy Court entered the Confirmation Order, which order has become a Final Order;

WHEREAS, this Bill of Sale is being executed and delivered by the Company to the Purchaser pursuant to Section 9.1 of the Purchase Agreement; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and for other good and valuable consideration, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Purchased Fixtures.  The Company, for good and valuable consideration as set forth in the Purchase Agreement, the Plan and the Confirmation Order, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the terms and provisions of the Purchase Agreement, the Plan, the Confirmation Order and this Bill of Sale, does hereby sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, and the Purchaser does hereby purchase, acquire, assume and accept from the Company, free and clear of any and all Liens and Claims, all of the Company's right, title and interest in, under and to the Purchased Fixtures.

2.      No Liability.  The Purchaser shall assume no Liability or obligation of the Company whatsoever related to the Purchased Fixtures or otherwise.

1

3.      Further Assurances.  Each party hereto shall, at the request of any other party hereto and without further conditions or consideration, take such other actions and execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, as such other party may reasonably request in order to more effectively consummate the transactions contemplated by this Bill of Sale, and assure fully to the Purchaser that all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Purchaser are conveyed to the Purchaser, all in accordance with and subject to the terms and conditions of the Transaction Documents.

4.      Amendment and Waiver.  This Bill of Sale may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Bill of Sale may be waived, only by a written instrument signed by all the parties.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Bill of Sale shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege pursuant to this Bill of Sale, nor shall any single or partial exercise of any right, power or privilege pursuant to this Bill of Sale, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Bill of Sale.  The rights and remedies provided pursuant to this Bill of Sale are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

5.      Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

6.      No Third Party Beneficiaries.  None of the provisions contained in this Bill of Sale are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Bill of Sale.

7.      Governing Law, Venue.  THIS BILL OF SALE SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE PURCHASER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS BILL OF SALE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS BILL OF SALE, OR THE BREACH, TERMINATION OR VALIDITY OF THIS BILL OF SALE, OR THE TRANSACTIONS CONTEMPLATED BY THIS BILL OF SALE.

8.      Entire Agreement.  This Bill of Sale, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, the Plan and the

Confirmation Order, including the agreements, exhibits and documents accompanying any of the foregoing, constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Bill of Sale, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties shall continue in full force and effect.

9.    <u>Headings.</u>  The headings in this Bill of Sale are for purposes of reference only and shall not limit or otherwise affect the meaning of this Bill of Sale.

10.    <u>Binding Effect</u>.  This Bill of Sale and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.    <u>Power of Attorney</u>.  The Company hereby constitutes and appoints the Purchaser, its successors and assigns, the Company's true and lawful attorney and attorneys, with full power of substitution, in the Company's name and stead, but on behalf, for the benefit and at the expense of the Purchaser, its successors and assigns, to demand and receive any and all of the Purchased Fixtures, and to execute and deliver receipts, releases and such other instruments or documents as the Purchaser may reasonably deem necessary or appropriate in connection with the demand and receipt of the same, and any part thereof, and from time to time to institute and prosecute in the Company's name, or otherwise, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Purchased Fixtures or for the collection and enforcement of any claim or right of any kind hereby sold, conveyed, transferred and assigned, or intended so to be, and to do all acts and things in relating to the Purchased Fixtures which the Purchaser, its successors or assigns shall deem desirable, the Company hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by the Company's or by its dissolution or in any manner or for any reason whatsoever.

[*SIGNATURE PAGE FOLLOWS*]

3

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed and delivered as of the date first above written.

DAFFY'S, INC.
By: _____
Name:
Title:


JERICHO ACQUISITIONS I LLC
By: _____
Name:
Title:

*[Signature Page to Bill of Sale]*

8631022

**Exhibit D**

**Form of IP Assignment and License**

**IP ASSIGNMENT & LICENSE**

THIS INTELLECTUAL PROPERTY ASSIGNMENT AND LICENSE AGREEMENT (together with all Schedules hereto, this "IP Assignment"), dated as of [_____], 2012, is made by and between Daffy's, Inc. ("Assignor"), and Jericho Acquisitions I LLC or its designees and assigns ("Assignee"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Asset Purchase, Assignment and Support Agreement (the "Purchase Agreement"), dated as of July 18, 2012, by and among the Assignor, Marcia Wilson, The Wilson 2003 Family Trust and the Assignee.

WHEREAS, pursuant to the Purchase Agreement, in connection with the Plan and subject to Bankruptcy Court approval, the Assignor has agreed to sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred and delivered, to Assignee, and Assignee desires to purchase, acquire, assume and accept all of Assignor's right, title and interest in, to and under the Purchased Intellectual Property as listed on Schedule A hereof, all as more fully described in the Purchase Agreement; and

WHEREAS, on [_____], 2012, the Assignor commenced the Chapter 11 Case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York;

WHEREAS, on [_____], 2012, the Bankruptcy Court entered the Confirmation Order, which order has become a Final Order;

WHEREAS, this IP Assignment is being executed and delivered by the Assignor to the Assignee pursuant to Section 9.1 of the Purchase Agreement; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and for other good and valuable consideration, the parties hereto, intending to be legally bound hereby, agree as follows:

1. _Assignment and Transfer_. Effective upon the date of full execution of this IP Assignment, Assignor hereby sells, assigns, transfers, and conveys to Assignee, its successors and assigns, free and clear of all liens, claims or other encumbrances and to the maximum extent provided under law, and Assignee accepts, all of Assignor's entire worldwide right, title and interest in, to and under the Purchased Intellectual Property, together with any and all goodwill connected with and symbolized by the Purchased Intellectual Property, the same to be held and enjoyed by Assignee for its own use and enjoyment and the use and enjoyment of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, as assignee of its entire right, title and interest therein, including in and to all rights therein provided by international conventions and treaties, all rights of priority and renewals, all income, royalties, damages, payments or other revenue now or hereafter due, attributable, or payable with respect thereto,

and all causes of action (either in law or in equity) and all rights to sue, counterclaim, and recover for past, present and future infringement, dilution, misappropriation, unlawful imitation, or other violation of or with the rights assigned hereunder, other than as set forth in the Purchase Agreement.

2.    No Liability.  Except with respect to the Liabilities and obligations expressly assumed by the Assignee with respect to the Purchased Intellectual Property arising from and relating solely to the period from and after the Closing Date, and not to the extent arising out of any activities prior to the Closing Date, the Assignee shall assume no Liability or obligation of the Assignor whatsoever related to the Purchased Intellectual Property or otherwise.

3.    License to Other Company Intellectual Property.  Assignor hereby grants (and, to the extent necessary to provide the scope of license contemplated in this section, shall cause its Affiliates to grant) a royalty-free non-exclusive license to Assignee to continue using any Intellectual Property that is not Purchased Intellectual Property and that is at the Closing Date affixed to or otherwise permanently displayed at or in any premises subject to a Purchased Lease (including, for the avoidance of doubt, any permanent signage located at such premises), which non-exclusive license shall continue only for so long as any Intellectual Property that is not Purchased Intellectual Property continues (without interruption) to be affixed to or otherwise permanently displayed at or in the premises subject to the Purchased Leases ("License").  The License is freely transferrable and sub-licensable by Assignee to any subsequent purchaser or lessee of any premises subject to a Purchased Lease.

4.    Further Assurances.  Each party hereto shall, at the request of any other party hereto and without further conditions or consideration, take such other actions and execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, as such other party may reasonably request in order to more effectively consummate the transactions contemplated by this IP Transfer Agreement, and assure fully to the Assignee that all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Assignee are conveyed to the Assignee, all in accordance with and subject to the terms and conditions of the Transaction Documents.

5.    Authorization to Record.  To the extent applicable, the parties hereto authorize and request the Commissioner of Patents and Trademarks of the United States, the Copyright Office of the United States, the corresponding entities or agencies in any applicable foreign countries, and all applicable domain name registries to record Assignee as the assignee and owner of all Purchased Intellectual Property.

6.    Amendment and Waiver.  This IP Transfer Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this IP Transfer Agreement may be waived, only by a written instrument signed by all the parties.  No delay on the part of any party in exercising any right, power or privilege pursuant to this IP Transfer Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege pursuant to this IP Transfer Agreement, nor shall any single or partial exercise of any right, power or privilege pursuant to this IP Transfer Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this IP Transfer Agreement.  The rights and remedies provided pursuant to

2

this IP Transfer Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

7.      Counterparts.  This IP Transfer Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

8.      No Third Party Beneficiaries.  None of the provisions contained in this IP Transfer Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this IP Transfer Agreement.

9.      Governing Law, Venue.  THIS IP TRANSFER AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE PARTIES HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS IP TRANSFER AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS IP TRANSFER AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS IP TRANSFER AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS IP TRANSFER AGREEMENT.

10.      Entire Agreement.  This IP Transfer Agreement, together with the Purchase Agreement and the exhibits and the documents referred to in the Purchase Agreement, the Plan and the Confirmation Order, including the agreements, exhibits and documents accompanying any of the foregoing, constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this IP Transfer Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties shall continue in full force and effect.

11.      Headings.  The headings in this IP Transfer Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of this IP Transfer Agreement.

12.      Binding Effect.  This IP Transfer Agreement and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13.    <u>Power of Attorney</u>.  The Assignor hereby constitutes and appoints the Assignee, its successors and assigns, the Assignor's true and lawful attorney and attorneys, with full power of substitution, in the Assignor's name and stead, but on behalf, for the benefit and at the expense of the Assignee, its successors and assigns, to demand and receive any and all of the Purchased Intellectual Property, and to execute and deliver receipts, releases and such other instruments or documents as the Assignee may reasonably deem necessary or appropriate in connection with the demand and receipt of the same, and any part thereof, and from time to time to institute and prosecute in the Assignor's name, or otherwise, for the benefit of the Assignee, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Assignee, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Purchased Intellectual Property or for the collection and enforcement of any claim or right of any kind hereby sold, conveyed, transferred and assigned, or intended so to be, and to do all acts and things in relating to the Purchased Intellectual Property which the Assignee, its successors or assigns shall deem desirable, the Assignor hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by the Assignor's or by its dissolution or in any manner or for any reason whatsoever.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, Assignor and Assignee have caused this IP Assignment to be duly executed in duplicate originals by their duly authorized representative as of the day and year first above written.

DAFFY'S, INC.                                      JERICHO ACQUISITIONS I LLC
(as Assignor)                                      (as Assignee)


By: _____    By:
Name:                                              _____
Title:                                             Name:
                                                   Title:



Sworn to and subscribed before me
this _____ day of _____, 2012.

_____
Notary Public
My Commission Expires: _____

*[Signature Page to IP Assignment]*

## Schedule A to IP Assignment

### Purchased Intellectual Property

**UNITED STATES TRADEMARK REGISTRATIONS**

| MARK | REGISTRATION NO. |
|------|------------------|
| DAFFY'S. HIGH FASHION. LOW PRICES. | 3344294 |
| DAFFY'S | 1485741 |

**DOMAIN NAMES**

www.daffys.com

8632840

**Schedule I**

**Purchased Intellectual Property**

### UNITED STATES TRADEMARK REGISTRATIONS

| MARK | REGISTRATION NO. |
|---|---|
| DAFFY'S. HIGH FASHION. LOW PRICES. | 3344294 |
| DAFFY'S | 1485741 |

### DOMAIN NAMES

www.daffys.com

## Schedule II

### Purchased Leases

1.  Lease Agreement dated September 16, 1998 between Daffy's, Inc. as Tenant and Elizabeth Metromall LLC as Landlord, and any amendments or modifications thereto, for Space No. 70 on the upper level of the shopping center commonly known as NJ MetroMall, located at the Intersection of Kapkowski Road and Elizabeth Waterfront Drive at N.J. Turnpike Exit 13A, Elizabeth, New Jersey.

2.  The Amended and Restated Lease Agreement dated as of January 1, 2012 between Daffy's, Inc. as Tenant and VIM Associates at Landlord, and any amendments or modifications thereto, for the land, building and improvements located at 346 Route 10, East Hanover, New Jersey.

3.  Lease Agreement dated November 9, 1983 between Daffy's, Inc. (formerly Daffy Dan's Bargaintown, Inc.) as Tenant and Levin Properties L.P. (formerly Levin Properties) as Landlord, and any amendments or modifications thereto, for certain space in the building located at 165 Route 4 West, Paramus, New Jersey.

4.  Lease Agreement dated January 29, 1987 between Daffy's, Inc. (formerly Daffy Dan's Bargaintown) as Tenant and Elizabeth Healthcare Foundation, successor to Elizabeth General Medical Center as Landlord, and any amendments or modifications thereto, for certain space in the shopping center located at the Intersection of US Highway 1 and 9 (Spring Street) and East Jersey Street, Elizabeth, New Jersey.

5.  Lease Agreement dated August 14, 1996 between Daffy's, Inc. as Tenant and VIM-3, L.L.C. as Landlord, and any amendments or modifications thereto, for the approximately 19 acre tract of land together with the existing building commonly known as One Daffy's Way, Secaucus, New Jersey.

6.  Lease Agreement dated October 30, 2006 between Daffy's, Inc. as Tenant and Abill Realty Corporation as Landlord, and any amendments or modifications thereto, for Store #9, 215 Route 46 West, Totowa, New Jersey.

7.  Indenture of Lease dated March 9, 1990 between Daffy's Inc. (formerly Daffy Dan's Bargaintown, Inc.) as Tenant and 335 Madison Avenue, LLC (formerly Builtland Partners) as Landlord, and any amendments or modifications thereto, for certain space in the building located at 335 Madison Avenue, New York, New York.

8.  Lease Agreement dated March 11, 2009 between Daffy's, Inc. as Tenant and Center Manhasset, LLC as Landlord, and any amendments or modifications thereto, for certain space in the shopping center located at 1900 Northern Boulevard, Manhasset, New York.

9.  Rental Agreement dated September 2, 1993 between Daffy's, Inc. as Tenant and Herald Center Department Store, L.P. as Landlord, and any amendments or modifications

thereto, for certain space in the building located at Herald Center, 1311 Broadway and 34th Street, New York, New York.

10. Lease Agreement dated June 14, 1994 between Daffy's, Inc. as Tenant and TRST New York, Inc., LAFP New York Inc. and The Alaska Permanent Fund Corporation, as tenants-in-common as Landlord, and any amendments or modifications thereto, for certain space in the building located at 135 East 57th Street, New York, New York.

11. Lease Agreement dated August 5, 1998 between Daffy's, Inc. as Tenant and 464 Broadway Associates LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 462-468 Broadway, New York, New York.

12. Lease Agreement dated June 5, 2001 between Daffy's, Inc. as Tenant and FC Queens Place Associates, LLC as Landlord, and any amendments or modifications thereto, for a certain space in the Queens Place Shopping Center, located at 88-01 Queens Boulevard, Elmhurst, New York.

13. Indenture of Sublease dated December 17, 2001 between Daffy's, Inc. as Tenant and FC Hanson Associates, LLC as Landlord, and any amendments or modifications thereto, for certain space located in Atlantic Terminal, 139 Flatbush Avenue, Brooklyn, New York.

14. Lease Agreement dated July 1, 2002 between Daffy's, Inc. as Tenant and Devash, LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 1775 Broadway, New York, New York.

15. Lease Agreement dated November 15, 2004 between Daffy's, Inc. as Tenant and 50 Broadway Realty Corp. as Landlord, and any amendments or modifications thereto, for certain space in the building located at 50 Broadway, New York, New York.

16. Store Lease dated October 1, 2006 between Daffy's, Inc. as Tenant and BJW Realty LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 3 East 18th Street, New York, New York.

17. Lease Agreement dated July 6, 2010 between Daffy's, Inc. as Tenant and Bay Plaza Community Center, LLC as Landlord, and any amendments or modifications thereto, for certain space in Bay Plaza, located at 2146 Bartow Avenue, Bronx, New York.

18. Lease Agreement dated December 17, 2010 between Daffy's, Inc. as Tenant and AI 229 West 43rd Street Property Owner, LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 229 West 43rd Street, New York, New York.

19. The Amended and Restated Lease Agreement made as of January 1, 2012 between Daffy's, Inc. as Tenant and VIMWILCO, L.P. as Landlord for the building located at 1700 Chestnut Street at the southwest corner of 17th Street and Chestnut Street, Philadelphia, Pennsylvania.

**Schedule III**

**Ownership of Equity Interests**

| NAME OF SHAREHOLDER | NUMBER OF SHARES | |
| --- | --- | --- |
| | Voting (Class A) | Non-Voting (Class B) |
| | (100,000 authorized) | (25,000,000 authorized) |
| | (100,000 outstanding) | (6,395,343 outstanding) |
| Marcia Wilson | 49,000 | 5,225,143 |
| Wilson 2003 Family Trust | 51,000 | --- |

**Exhibit 1.66**

**List of Real Property Leases with Cure Costs**

| **Real Property Leases** | **Cure Costs** |
|---|---|
| Lease Agreement dated September 16, 1998 between Daffy's, Inc. as Tenant and Elizabeth Metromall LLC as Landlord, and any amendments or modifications thereto, for Space No. 70 on the upper level of the shopping center commonly known as NJ MetroMall, located at the Intersection of Kapkowski Road and Elizabeth Waterfront Drive at N.J. Turnpike Exit 13A, Elizabeth, New Jersey. | $0.00 |
| The Amended and Restated Lease Agreement dated as of January 1, 2012 between Daffy's, Inc. as Tenant and VIM Associates at Landlord, and any amendments or modifications thereto, for the land, building and improvements located at 346 Route 10, East Hanover, New Jersey. | $0.00 |
| Lease Agreement dated November 9, 1983 between Daffy's, Inc. (formerly Daffy Dan's Bargaintown, Inc.) as Tenant and Levin Properties L.P. (formerly Levin Properties) as Landlord, and any amendments or modifications thereto, for certain space in the building located at 165 Route 4 West, Paramus, New Jersey. | $0.00 |
| Lease Agreement dated January 29, 1987 between Daffy's, Inc. (formerly Daffy Dan's Bargaintown) as Tenant and Elizabeth Healthcare Foundation, successor to Elizabeth General Medical Center as Landlord, and any amendments or modifications thereto, for certain space in the shopping center located at the Intersection of US Highway 1 and 9 (Spring Street) and East Jersey Street, Elizabeth, New Jersey. | $0.00 |
| Lease Agreement dated August 14, 1996 between Daffy's, Inc. as Tenant and VIM-3, L.L.C. as Landlord, and any amendments or modifications thereto, for the approximately 19 acre tract of land together with the existing building commonly known as One Daffy's Way, Secaucus, New Jersey. | $0.00 |
| Lease Agreement dated October 30, 2006 between Daffy's, Inc. as Tenant and Abill Realty Corporation as Landlord, and any amendments or modifications thereto, for Store #9, 215 Route 46 West, Totowa, New Jersey. | $0.00 |

| **Real Property Leases** | **Cure Costs** |
|---|---|
| Indenture of Lease dated March 9, 1990 between Daffy's Inc. (formerly Daffy Dan's Bargaintown, Inc.) as Tenant and 335 Madison Avenue, LLC (formerly Builtland Partners) as Landlord, and any amendments or modifications thereto, for certain space in the building located at 335 Madison Avenue, New York, New York. | $0.00 |
| Lease Agreement dated March 11, 2009 between Daffy's, Inc. as Tenant and Center Manhasset, LLC as Landlord, and any amendments or modifications thereto, for certain space in the shopping center located at 1900 Northern Boulevard, Manhasset, New York. | $0.00 |
| Rental Agreement dated September 2, 1993 between Daffy's, Inc. as Tenant and Herald Center Department Store, L.P. as Landlord, and any amendments or modifications thereto, for certain space in the building located at Herald Center, 1311 Broadway and 34th Street, New York, New York. | $0.00 |
| Lease Agreement dated June 14, 1994 between Daffy's, Inc. as Tenant and TRST New York, Inc., LAFP New York Inc. and The Alaska Permanent Fund Corporation, as tenants-in-common as Landlord, and any amendments or modifications thereto, for certain space in the building located at 135 East 57th Street, New York, New York. | $0.00 |
| Lease Agreement dated August 5, 1998 between Daffy's, Inc. as Tenant and 464 Broadway Associates LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 462-468 Broadway, New York, New York. | $0.00 |
| Lease Agreement dated June 5, 2001 between Daffy's, Inc. as Tenant and FC Queens Place Associates, LLC as Landlord, and any amendments or modifications thereto, for a certain space in the Queens Place Shopping Center, located at 88-01 Queens Boulevard, Elmhurst, New York. | $0.00 |
| Indenture of Sublease dated December 17, 2001 between Daffy's, Inc. as Tenant and FC Hanson Associates, LLC as Landlord, and any amendments or modifications thereto, for certain space located in Atlantic Terminal, 139 Flatbush Avenue, Brooklyn, New York. | $0.00 |

2

| **Real Property Leases** | **Cure Costs** |
|---|---|
| Lease Agreement dated July 1, 2002 between Daffy's, Inc. as Tenant and Devash, LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 1775 Broadway, New York, New York. | $0.00 |
| Lease Agreement dated November 15, 2004 between Daffy's, Inc. as Tenant and 50 Broadway Realty Corp. as Landlord, and any amendments or modifications thereto, for certain space in the building located at 50 Broadway, New York, New York. | $0.00 |
| Store Lease dated October 1, 2006 between Daffy's, Inc. as Tenant and BJW Realty LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 3 East 18th Street, New York, New York. | $0.00 |
| Lease Agreement dated July 6, 2010 between Daffy's, Inc. as Tenant and Bay Plaza Community Center, LLC as Landlord, and any amendments or modifications thereto, for certain space in Bay Plaza, located at 2146 Bartow Avenue, Bronx, New York. | $0.00 |
| Lease Agreement dated December 17, 2010 between Daffy's, Inc. as Tenant and AI 229 West 43rd Street Property Owner, LLC as Landlord, and any amendments or modifications thereto, for certain space in the building located at 229 West 43rd Street, New York, New York. | $0.00 |
| The Amended and Restated Lease Agreement made as of January 1, 2012 between Daffy's, Inc. as Tenant and VIMWILCO, L.P. as Landlord for the building located at 1700 Chestnut Street at the southwest corner of 17th Street and Chestnut Street, Philadelphia, Pennsylvania. | $0.00 |

3

**<u>Exhibit 8.1</u>**

**List of Assumed Executory Contracts**

US_ACTIVE:\44037104\16\39982.0003

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| ADP, INC.<br><br>Attn: Timothy D. Lamb<br>5800 Windward Parkway<br>Alpharetta, GA 30005 | National Accounts Division Master Service Agreement (Effective Date 02/15/00) | $0.00 |
| ADP, INC<br><br>Attn: General Manager<br>400 Covina Boulevard<br>Dan Dimas, CA 91773-2983 | National Accounts Division Master Service Agreement (Effective Date 02/15/00) | $0.00 |
| ALLEN GROSS<br><br>66 Brandywyne Dr.<br>Florham Park, NJ 07932 | Agreement and General Release By and Between Daffy's and Allen Gross as Amended Dated 4/24/12 | $0.00 |
| CARYN LERNER<br><br>12 Surf Road<br>Westport, CT 06880 | Release For Claims Against Company | $0.00 |
| CARYN LERNER<br><br>12 Surf Road<br>Westport, CT 06880 | Employment Agreement | $0.00 |
| CARYN LERNER<br><br>12 Surf Road<br>Westport, CT 06880 | Nonqualified Stock Option Award Agreement | $0.00 |
| CARYN LERNER<br><br>12 Surf Road<br>Westport, CT 06880 | Waiver Of Notice | $0.00 |
| CARYN LERNER<br><br>12 Surf Road<br>Westport, CT 06880 | Separation And Release Agreement | $0.00 |
| CHRIS FRIEDLANDER<br><br>21 Pondfield Parkway<br>Mount Vernon, NY 10552 | Settlement Agreement By Daffy's and Chris H. Friedlander Dated March 15, 2011 | $0.00 |
| CHUBB & SON FEDERAL INSURANCE<br><br>Attn: Underwriting<br>Chubb Specialty Insurance<br>15 Mountain View Road<br>Warren, NJ 07059 | Cyber Liability Insurance Policy #8222-3512 | $0.00 |

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| CHUBB GROUP OF INSURANCE COMPANIES<br><br>15 Mountain View Road<br>Warren, NJ 07059 | Kidnap/Ransom & Extortion Non-Liability Coverage<br><br>(Policy Number: 8225-3065) | $0.00 |
| CHUBB GROUP OF INSURANCE COMPANIES<br><br>15 Mountain View Road<br>Warren, NJ 07059 | Excess Liability Insurance Policy #7981-62-69 | $0.00 |
| CIGNA<br><br>4616 South U.S. Hwy 75<br>Denison, TX 75020 | Cigna Dental Plan | $0.00 |
| CIGNA HEALTH AND LIFE INSURANCE CO.<br><br>Attn: Shermona Mapp, Corp. Sec.<br>Routing B2 CAU<br>900 Cottage Grove Road<br>Hartford, CT 06152 | Minimum Premium Program Cash Management Program Policy No. 3331736 As Amended | $0.00 |
| CIGNA HEALTH AND LIFE INSURANCE CO.<br><br>499 Washington Blvd., 4th Floor, Jersey City, NJ 07310 | Policy Nos. 3331736-HRA, HRA2, OAP1 Open Access Plus Medical Benefits Effective Date: May 1, 2012 (unexecuted copy) | $0.00 |
| CIGNA HEALTH AND LIFE INSURANCE CO.<br><br>499 Washington Blvd., 4th Floor, Jersey City, NJ 07310 | Dental Benefit (Choice Plan) – group medical, dental and vision plan (plan no. 501) effective May 1, 2010 (unexecuted copy) | $0.00 |
| CIGNA HEALTHCARE<br><br>499 Washington Blvd., 4th Floor, Jersey City, NJ 07310 | Dental Benefit (Network plan) – group medical, dental and vision plan (plan no. 501) effective May 1, 2010 (unexecuted copy) | $0.00 |
| CIGNA HEALTHCARE CONTRACTUAL AGREEMENTS UNIT<br><br>Underwriting Routing B2 cau<br>900 Cottage Grove Road<br>Hartford, CT 06152 | Cash Management Program/ Minimum Premium Arrangement | $0.00 |

2

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| CIGNA HEALTHCARE<br><br>Attn: Dietrich J Krauland<br>Contractual Agreements Unit<br>Underwriting Routing B2 cau<br>900 Cottage Grove Road<br>Hartford, CT 06152 | Administrative Services Only Agreement<br>Account Nos. 2471962 & 3331736 | $0.00 |
| CIGNA HEALTHCARE<br><br>Attn: Jessica S Sheriff<br>Contractual Agreements Unit<br>Underwriting Routing B2 cau<br>900 Cottage Grove Road<br>Hartford, CT 06152 | Supplemental Premium Agreement<br>Account No. 3331736<br>Dated April 16, 2009 | $0.00 |
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY<br><br>Attn: John J. O'Gorman, Regional Director<br>900 Cottage Grove Road<br>Hartford, CT 06152 | Administrative Services Only Agreement By and Between Daffy's, Inc. and Connecticut Life Insurance Company Effective Date 5/01/2009 | $0.00 |
| CORT SOFTWARE, INC.<br><br>Attn: Gary E. Lawrence, Pres./CEO<br>855 SW Yates Dr. Suite 201<br>Bend, OR 97702 | Software License Agreement (2007- Sla-5570) Between Daffy's, Inc. and Court Software, Inc. Dated  12/5/06 | $0.00 |
| DONLIN, RECANO & COMPANY, INC.<br><br>419 Park Avenue South Suite 1206<br>New York, NY 10016 | Standard Claims and Noticing Agreement | $0.00 |
| FEDERAL INSURANCE CO.<br><br>C/O Chubb Group of Insurance Companies<br>82 Hopmeadow Str.<br>Simsbury, CT 06070 | Crime Insurance<br>Policy #8207-7124 | $0.00 |
| FIRST INSURANCE FUNDING CORP.<br><br>450 Skokie Blvd, Suite 1000<br>P.O. Box 3306<br>Northbrook, IL 60065-3306 | Commercial Premium Finance Agreement And Disclosure Statement Dated 7/20/2012 | $0.00 |

3

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| GORDON BROTHERS RETAIL PARTNERS, LLC<br><br>101 Huntington Avenue, 10th Floor<br>Boston, MA 02199<br>Attention: Michael Chartock | Agency Agreement | $0.00 |
| HARLEYSVILLE INS. CO.<br><br>395 Maple Avenue<br>Harleysville, PA 19438 | Liability Insurance<br>Policy # MP A83241J | $0.00 |
| HARLEYSVILLE INS. CO.<br><br>395 Maple Avenue<br>Harleysville, PA 19438 | Excess Liability Insurance<br>Policy # CMB86089J | $0.00 |
| HARLEYSVILLE INS. CO.<br><br>395 Maple Avenue<br>Harleysville, PA 19438 | Auto Insurance<br>Policy # BA41063B  NJ | $0.00 |
| HERALD CENTER DEPARTMENT STORE TENANT LLC<br><br>C/O J.E.M.B. Realty<br>Attn: Morris Baily<br>150 Broadway, Suite 800<br>New York, NY 10038 | Option Agreement | $0.00 |
| HILCO MERCHANT RESOURCES, LLC<br><br>5 Revere Drive<br>Northbrook, IL 60062<br>Attention: Ian Fredericks | Agency Agreement | $0.00 |
| JERICHO ACQUISITIONS I LLC<br><br>150 Broadway, Suite 1800<br>New York, NY 10038<br>Attn: Morris Bailey | Agreement Among The Debtor, Marcia Wilson, The Wilson 2003 Family Trust and Jericho Acquisitions I LLC Dated July 18, 2012 | $0.00 |
| JOHN PENNIPLEDE (DMP ESTATES, INC.)<br><br>P.O. Box 4265<br>Osborneville, NJ 08723 | Lease – Display Storage | $0.00 |

4

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| LEE HECHT HARRISON<br><br>Attn: Teri Swanson, Senior Vice President<br>200 Park Avenue , 26th Floor<br>New York, NY 10166 | Services Agreement<br>Outplacement Services | $0.00 |
| LIBERTY MUTUAL INSURANCE<br><br>75 Remittance Drive<br>Suite 1837<br>Chicago, IL 60675 | Property Insurance<br>Policy # Yu2-L9l-425122010 | $0.00 |
| MARCIA WILSON AND THE MANAGEMENT STOCKHOLDERS<br><br>C/O Daffy's Inc.<br>Attn: Marcia Wilson<br>Daffy's Way<br>Secaucus, NJ 07094 | Form of Stockholders Agreement Among Daffy's, Inc., Marcia Wilson, The Wilson Stockholders and The Management Stockholders | $0.00 |
| MARVIN TRAUB ASSOCIATES<br><br>Attn: Mr. Geoffrey D. Lurie<br>410 Park Avenue Suite 910<br>New York, NY 10022 | Bankruptcy Consulting Service Agreement Dated July 2, 2012 by and Between Daffy's Inc And Marvin Traub Associates (Unexecuted Copy) | $0.00 |
| NATIONAL SURETY CORP (FIREMAN'S FUND INS. CO.)<br><br>P.O. Box 777<br>Novato, CA 94998 | Excess Liability Insurance Policy # SHX 00048404909 | $0.00 |
| NEW JERSEY MANUFACTURERS INSURANCE COMPANY<br><br>301 Sullivan Way<br>West Trenton, NJ 08628 | Workers Compensation and Employers Liability Insurance Policy # W20482-6-12 & W20482-6-2 | $0.00 |
| NU VIEW SYSTEMS, INC<br><br>200 Brickstone Square, Suite 303<br>Andover, MA 01810 | Software License Agreement (2007-Sla-5570) | $0.00 |
| STATE INSURANCE FUND<br><br>199 Church Street<br>New York, NY 10007 | NJ Workers Comp<br>Policy #11434529 | $0.00 |
| STEVE PACKLES<br><br>605 Standish Road<br>Teaneck, NJ 07666 | Separation and Release Agreement | $0.00 |

5

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| STEVE PACKLES<br><br>605 Standish Road<br>Teaneck, NJ 07666 | Employment Agreement By and Between Daffy's, Inc. and Steve Packles | $0.00 |
| STEVE PACKLES<br><br>605 Standish Road<br>Teaneck, NJ 07666 | Release For Claims Against Company | $0.00 |
| THE HARTFORD COMPANY<br><br>P.O. Box 4771<br>Syracuse, NY 13221 | Workers Compensation Policy No. 16 WE DE7444 Insurance Carrier | $0.00 |
| THE HARTFORD<br><br>Hartford Plaza<br>Hartford, CT 06115 | Workers Compensation Policy No. 16 WE DE7444 Insurance Carrier | $0.00 |
| THE STATE INSURANCE FUND<br><br>199 Church Street<br>New York, NY 10007 | Workers Compensation And Employers Liability Insurance Policy No. Z 1143452-9 (Information Documents) | $0.00 |
| TRAVELERS INS CO.<br><br>One Tower Square<br>Hartford, CT 06183 | Ocean Cargo –Policy No. Oc09000623 (No Hardcopy) | $0.00 |
| TWIN CITY FIRE INS CO. (HARTFORD INS. CO.)<br><br>3600 Wiseman Blvd.<br>San Antonio, TX 78251 | PA Workers Comp Insurance Policy # 16WE DE 7444 | $0.00 |
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza<br>Omaha, NE 68175 | Elect Life Supplemental Insurance Plan; Group Master Policy No. Glg-Xl10 (Unexecuted Copy) | $0.00 |
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza<br>Omaha, NE 68175 | Group Term Life and AD&D Insurance Summary of Coverage Policy No. Glug-945E | $0.00 |
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza<br>Omaha, NE 68175 | Group Life and Accidental Death and Dismemberment Benefits for all Eligible Employees Classified By the Employer as Executives Policy No. Glug-945E Revised May 1, 2009 (Unexecuted Copy) | $0.00 |

US_ACTIVE:\44037104\16\39982.0003

| Creditor Name and Address | Contract Description | Cure Amount |
|---|---|---|
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza Omaha, NE 68175 | Group Life and Accidental Death and Dismemberment Benefits for Retirees Policy No. Glug-945E, Effective May 1, 2012 (Unexecuted Copy) | $0.00 |
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza Omaha, NE 68175 | Group Life and Accidental Death and Dismemberment Benefits for All Eligible Hourly Employees No. Glug-945E, Effective May 1, 2011 (Unexecuted Copy) | $0.00 |
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza Omaha, NE 68175 | Group Voluntary Long-Term Disability Insurance Policy No Gupr-945E, Effective September 1, 2010 (Unexecuted Copy) | $0.00 |
| UNITED OF OMAHA LIFE INSURANCE COMPANY<br><br>Mutual of Omaha Plaza Omaha, NE 68175 | Group Voluntary Long-Term Disability Insurance For All Eligible Officers, Owners and Vice Presidents Policy No. Gupr-945e Effective September 1, 2010 as Revised June 1, 2011 (Unexecuted Copy) | $0.00 |
| VANESSA LEFEBVRE<br><br>1119 Washington St.# 1 Hoboken, NJ 07030 | Employment Agreement | $0.00 |
| VANESSA LEFEBVRE<br><br>1119 Washington St.# 1 Hoboken, NJ 07030 | Separation and Release Agreement | $0.00 |
| VISION SERVICE PLAN INSURANCE COMPANY<br><br>3333 Quality Drive, Rancho Cordova, CA 95670 | Group Vision Care Plan Group No. 30013624 Effective Date: May 1, 2009 | $0.00 |
| WESTCHESTER FIRE<br><br>C/O Ace USA Attn: Chief Underwriting Officer 140 Broadway 41st Floor New York, NY 10005 | D&O Insurance Policy # G 2422031A 001 | $0.00 |

7

## **Exhibit 8.3**

**List of Rejected Executory Contracts**

Please note that the Debtor will include in its proposed order confirming the Debtor's Plan under chapter 11 of the Bankruptcy Code a provision that the Debtor has no obligation to return any property to any party to a rejected executory contract or unexpired lease, but the Debtor shall reasonably cooperate with any parties seeking to retrieve such property by providing access to such property, and requiring that parties to rejected contracts with the Debtor must retrieve any property they have leased to the Debtor under rejected contracts within twenty-eight days of the order, or forfeit their right to recover such property.

| Creditor Name and Address | Contract Description |
|---|---|
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F. Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Commercial Sales Proposal/Agreement dated 08/06/04 (101-1) |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F. Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Commercial Sales Proposal/Agreement dated 03/09/04 (101-2) |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F. Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Commercial Sales Proposal/Agreement dated 02/25/03 (101-3) |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F. Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Commercial Sales Proposal/Agreement dated 02/25/03 (101-4) |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Michael Jorda<br>29 Commerce Way<br>Totowa, NJ 07512 | Commercial Sales Proposal/Agreement |
| ADT SECURITY SERVICES, INC.<br><br>290 Veterans Blvd<br>Rutherford, NJ 07070 | Commercial Sales Proposal/Agreement dated 10/08/99 (101-5) |
| ADT SECURITY SERVICES, INC.<br><br>24 Bridewell Place<br>Clifton, NJ 07014 | Focus Commercial Proposal/Agreement<br>Digital Communicator for:<br>Daffy Dans<br>346 Rt. 10,<br>East Hanover, NJ 07836 |

| Creditor Name and Address | Contract Description |
|---|---|
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Commercial Sales Proposal/Agreement for:<br>Daffy's<br>Route 1 & 9<br>Elizabeth, NJ 07202 |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Renewal Of Existing System Customer No.03836 for:<br>Daffy's<br>Spring Street & Jersey Street  Elizabeth, NJ 07201 |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Angel F Rivera<br>21 Northfield Avenue<br>Edison, NJ 08837 | Rider For Additional Service for:<br>Daffy's<br>Spring Street & Jersey Street Elizabeth, NJ 07201 |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Julie Mahdy-Spiegler, Sales Rep<br>53 West 23rd Street 2nd Floor<br>New York, NY 10010 | Commercial Sales<br>Digital Communicator for:<br>Daffy's<br>335 Madison Ave<br>New York, NY<br>Dated 10/3/00 |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Julie Mahdy-Spiegler, Sales Rep<br>53 West 23rd Street 2nd Floor<br>New York, NY 10010 | Commercial Sales for:<br>Daffy's<br>1311 Broadway  & 34th Street<br>New York, NY |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Julie Mahdy-Spiegler, Sales Rep<br>53 West 23rd Street 2nd Floor<br>New York, NY 10010 | Commercial Sales for:<br>Daffy's<br>125 57th Street<br>New York, NY |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Julie Mahdy-Spiegler, Sales Rep<br>53 West 23rd Street 2nd Floor<br>New York, NY 10010 | Commercial Sales for:<br>Daffy's<br>462 Broadway<br>New York, NY<br>Dated 5/22/2002 |
| ADT SECURITY SERVICES, INC.<br><br>Attn: Julie Mahdy-Spiegler, Sales Rep<br>53 West 23rd Street 2nd Floor<br>New York, NY 10010 | Commercial Sales for:<br>Daffy's<br>88-01 Queens Blvd<br>Elmhurst, NY  11373<br>Dated 10/05/200 as amended 2/19/03 |
| ADT SECURITY SERVICES, INC.<br>Attn: Stephen Pagnotti<br>602 Office Center Dr. Suite 100<br>Fort Washington, Pa 19034 | Commercial Sales Agreement 1700 Chestnut St.<br>Philadelphia, PA<br>Dated 1/28/2009 |

US_ACTIVE:\44037104\16\39982.0003

| Creditor Name and Address | Contract Description |
|---|---|
| BMW OF MANHATTAN INC.<br>555 West 47th Street<br>New York, NY 10019 | Motor Vehicle Lease Agreement- New York- 299475 Dated On 11/30/2011 (Term: 36 Months) |
| BROGAN CADILLAC CO<br><br>112 Rte. 46 East<br>Totowa, NJ 07512 | Motor Vehicle Lease Agreement dated 11/5/2010 Vehicle Id No. 1G6KA5E67BU105441, Cadillac DTS 2011<br>(Term: 39 Months) |
| D & B POWER ASSOCIATES<br><br>453 Dunham Rd., Ste 100<br>St Charles, IL 60174 | Schneider Electric Service Offerings For Silicon For One Year |
| DEVITO/ VERDI<br><br>100 Fifth Avenue<br>New York, NY 10011 | Media Estimate # Daffy's OOH-Q2-Q3 2012 |
| ELECTRO-PROTECTIVE CORPORATION<br>60 Lafayette  Street<br>Newark, NJ 07102 | Central  Station Alarm Signaling System at Premises Route 10 Hanover, NJ 07936 |
| FIFTEEN DEGREES LTD.<br><br>Manulife Center<br>44 Charles Street West, Suite 1806<br>Toronto ON M4y 1r7 Canada | Times Square (#215) Digital Media System Mgmt and Maintenance, dated  9/29/2011 (Term: 3 years) |
| HORIZON BEHAVIORAL SERVICES, LLC<br><br>Attn: Hyong Un<br>Head of EAP & Chief  Psychiatric Officer<br>An Aetna Company<br>P.O. Box 840843<br>Dallas, TX 75284 | Employee Assistance Program Services Agreement |
| HORIZON BEHAVIORAL SERVICES, LLC<br><br>Attn: Product Head –Hbs Eap<br>4300 Centreway Place Mail Code:756<br>Arlington, TX 76018 | Employee Assistance Program Services Agreement |
| HUDSON ENERGY<br><br>1650 Market Street, 36th Floor<br>Philadelphia, PA 19103 | Electricity Offer Sheet Number H12030708665138/ Account No. 6846501406 |
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number H12030708664957/ Account No. 08015060620000506587 |

3

| Creditor Name and Address | Contract Description |
|---|---|
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number H12031508748092/ Account No. 00001000376624532 |
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number H12031508748092/Account No. 00001014312294407 |
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number H12031508748092/Account No. 00000951116213988 |
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number H12031508748092/Account No. 00001105825253995 |
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number: H12031508748092/Account No. 00000862366273994 |
| HUDSON ENERGY<br><br>4 Executive Blvd. Suite 301<br>Suffern, NY 10901 | Electricity Offer Sheet Number H12031508748092/Account No. 00001171408894765 |
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance Plan (Proposal No D9082509) For 139 Flatbush Ave, Brooklyn, NY 11373 |
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance Plan (Proposal No D7082509) For 50 Broadway New York, NY 10004 |
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance Plan (Proposal No D6082509 ) For 462 Broadway New York, NY 10013 |
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance Plan (Proposal No D1082509 ) For 1775 Broadway New York, NY 10019 |
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance Plan (Proposal No D022311 ) For 2120 Bartow Ave, Bronx, NY 10475 |

4

| Creditor Name and Address | Contract Description |
|---|---|
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance  Plan (Proposal No D2082509 ) For 135 East 57th Street  New York, NY 10022 |
| HUGHES ENVIRONMENTAL ENGINEERING INC<br>240 West Grand Avenue<br>Montvale, NJ 07645 | Comprehensive Facilities Services Maintenance  Plan (Proposal No DO041111 For 1900 Northern Blvd Manhasset, NY |
| IKON FINANCIAL SERVICES<br><br>c/o Ikon Office Solutions, Inc.<br>Attn: Ikon Quality Assurance Department<br>3920 Arkwright Road<br>Macon, GA 31210 | Image Management<br>Amendment No. 1294560, Master Agreement No. 1014472A4 as amended (Equipment Change), dated March 1, 2011 |
| IKON FINANCIAL SERVICES<br><br>C/O Ikon Office Solutions, Inc.<br>Attn: Ikon Quality Assurance Department<br>3920 Arkwright Road<br>Macon, GA 31210 | Product Schedule<br>Master Agreement No. 1014472, dated 11/17/11 (Minimum Term: 36 Months) |
| IKON FINANCIAL SERVICES<br><br>C/O Ikon Office Solutions, Inc.<br>Attn: Ikon Quality Assurance Department<br>3920 Arkwright Road<br>Macon, GA 31210 | Product Schedule - Part of Master Agreement |
| IKON FINANCIAL SERVICES<br><br>70 Valley Stream Parkway<br>Malvern PA 19355 | Services Agreement<br>Account No. 1294560-1014472A4A |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Product Schedule Ricoh Copier MP2500 (Minimum Term: 36 Months)<br>Additional Equipment Schedule, dated July 17, 2009 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Product Description: Ric Ficio MP171SPF; Ricoh Copier MPS500<br>Cities: Elizabeth, New York, Paramus |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Product Description: Ric Aficio MP171SPF; Ricoh Copier MP2500<br>Cities: Philadelphia, New York, Manhasset, Totowa |

US_ACTIVE:\44037104\16\39982.0003

| Creditor Name and Address | Contract Description |
|---|---|
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Product Description: Ricoh Copier Mp2500<br>Cities: New York, East Hanover |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Product Description: Ric Aficio Mp 171SPF/ Ricoh Copier MP2500<br>Cities: New York, White Plains, Smithtown, Elmhurst |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Product Description: Ric Aficio Mp 171SPF/ Ricoh Copier MP2500<br>Cities: Brooklyn, Elizabeth |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Canon 20201/Mcj00537/ MCJ 00726/MCJ 00511/ Ricoh 161 SPF/M0178501482 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Canon 20201/Mcj01070/ MCJ00086/ MCJ 00415 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Canon 20201/Mcj01184/ MCJ 00505/ Ricoh 161spf/M0178501630 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Canon 20201/Mcj00163/ 00499/MCJ01068 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Canon 20201/Mcj00498/ 00507/ Ricoh 161 SPF/M0178501628 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Canon 20201/Mcj00506/ MCJ 00732/ Ricoh 161 SPF/ M0169600583 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Equipment Removal Authorization: Ricoh 161 SPF/ M0169600577 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Image Management/ Image Management Plus Amendment On Agreement No. 1294560-1014472A4- Ricoh Mp171 SPF Serial #C41027169 |

US_ACTIVE:\44037104\16\39982.0003

| Creditor Name and Address | Contract Description |
|---|---|
| IKON FINANCIAL SERVICES<br><br>1738 Bass Road<br>Macon, GA 31210 | Letter: Re Finance<br>Account #1294560-1014472A4A |
| IKON FINANCIAL SERVICES<br><br>P.O. BOX 41564<br>Philadelphia, PA 19101 | Services Agreement<br>Account No. 1294560-1014472A4A |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Product Schedule Image Management Plus |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Additional Equipment Schedule |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Image Management/Image Management Plus Amendment<br>Account# 1294560-1014472A4A |
| IKON FINANCIAL SERVICES<br><br>1738 Bass Road<br>Macon, GA 31210 | Image Management/Image Management Plus Amendment - Account# 1294560-1014472A4A |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Product Schedule - Master Agreement Number: 1014472 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Image Plus Management Product Schedule Master Agreement Number 1014472 |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Additional Equipment Addendum |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Image Management Plus Agreement (Richoh Aficio MP C4501), dated 1/17/12<br>(Minimum Term: 60 Months) |
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Image Management Plus Agreement (Richoh Pro 1107ex & 1107 Printer Only Version), dated 11/21/11<br>(Minimum Term: 36 Months) |

7

| Creditor Name and Address | Contract Description |
|---|---|
| IKON FINANCIAL SERVICES<br><br>P.O. Box 9115<br>Macon, GA 31208-9115 | Image Management Plus Agreement - Computer Room High Speed |
| IKON OFFICE SOLUTIONS, INC.<br><br>567 Route 46 West<br>Fairfield, NJ 07004 | Sales Order/Service Order combined with Contract # 1014472A4 pursuant to the Master Agreement No. 1014472 |
| IKON OFFICE SOLUTIONS, INC.<br><br>567 Route 46 West<br>Fairfield, NJ 07004 | Sales Order/Service Order<br>Buyout of Asset No. 2944195 from Customer No. 1294560, Contract No. 101 1014472A4, dated 3/16/11 |
| IKON OFFICE SOLUTIONS, INC.<br><br>Attn: Ikon Quality Assurance Dept<br>3920 Arkwright Road<br>Macon, GA 31210 | Work Order: Us Connect Svc Tech |
| IKON OFFICE SOLUTIONS, INC.<br><br>567 Route 46 West<br>Fairfield, NJ 07004 | Work Order: US<br>Base Eq. Model No. MP2851SP dated on 11/14/11 (Term: 36 Months) |
| IKON OFFICE SOLUTIONS, INC.<br><br>3920 Arkwright Rd.<br>Macon, GA 31210 | Master Maintenance and Sale Agreement<br>Unexecuted Copy dated 3/23/11 |
| IKON OFFICE SOLUTIONS, INC.<br><br>3920 Arkwright Road<br>Macon, GA 31210 | Equipment Removal Authorization dated 3/16/11<br>Ricoh/171SPF/V4498901684 |
| KRONOS<br><br>297 Billerica Road<br>Chelmsford, MA 01824 | Kronos Sales, Software License and Services Agreement dated 9/28/2011<br>Rev KR - 080706 |
| LUXURY CARS OF SOUTHHAMPTON INC.<br>759 County Road 39A<br>Southampton, NY 11968 | Motor Vehicle Lease Agreement-Deal No. 20960-Mercedes CLK 2009 Lease Date: 4/9/2010 (Term 36 Months) |
| OPEN ROAD AUTO GROUP<br><br>198 Madison Avenue<br>Morristown, NJ 07960 | Motor Vehicle Lease dated 5/19/11<br>Deal No. 124093 Mini Cooper 2011<br>(Term: 36 Months) |
| PALISADES VOLKSWAGEN<br><br>179 Route 59<br>Nyack, NY 10960 | Motor Vehicle Lease Agreement dated 1/22/11<br>6713700 Volkswagen 2011<br>(Term: 36 Months) |

8

| Creditor Name and Address | Contract Description |
|---|---|
| PAUL MILLER<br><br>179 Route 46<br>Parsippany, NJ 07054 | Motor Vehicle Lease Agreement dated 3/15/10<br>88379-Audi 2010<br>(Term: 36 Months) |
| PITNEY BOWES GLOBAL FINANCIAL SERVICES, LLC<br><br>Attn: Theresa Guirnalda, A/P Mgr<br>P.O. Box 371896<br>Pittsburgh, PA 15250 | Relating To Equipment Lease Agreement# 3396927/004<br>dated 6/24/2011<br>(Term: 51 Months) |
| PITNEY BOWES INC.<br><br>P.O. Box 371896<br>Pittsburgh, PA 15250 | Service Level Agreement, Software Maintenance, Soft-Guard Subscription, Intellilink Subscription/ Meter Rental/Value Based Services Agreement |
| SUBSCRIBER MAIL LLC<br><br>Attn: Will Beck<br>3333 Warrenville Road Ste. 530<br>Lisle, IL 60532 | Program Investment/ License Agreement Service<br>(Term: 3/1/2012-2/28/2013) |
| STATEWIDE FIRE CORP<br>2047 Victory Blvd<br>Staten Island, NY 10314 | Fire Alarm Monitoring Agreement Acct No 713642<br>Dated 3/30/2012 |
| TOYOTA WORLD L.L.C.<br><br>P.O. Box 22202<br>Owings Mills, MD 21117 | Motor Vehicle Lease Extension Agreement by and between Toyota World and Daffy's<br>Account No. 02-0562-Gd382<br>(Term: 6 Months from 3/9/12) |
| USB LEASING LT<br><br>1850 Osborn Avenue<br>Oshkosh, WI 54902 | Motor Vehicle Lease Agreement<br>Vehicle Id No. 1G6KA5E67BU105441, Cadillac DTS 2011 |
| WELLS FARGO ALARM SERVICES, INC.<br>53 West 23rd Street<br>New York, NY 10010 | Central Station Protective Signaling Service Contract<br>No 998-1 |
| WELLS FARGO ALARM SERVICES, INC.<br>53 West 23rd Street<br>New York, NY 10010 | Schedule of Equipment- Contract No. 998-2/4 |

US_ACTIVE:\44037104\16\39982.0003